# Exhibit 1

**Kevin Thomason**

---

**From:** JOLYNE ROBERTS [speedybeanie@msn.com]
**Sent:** Tuesday, August 01, 2006 1:20 PM
**To:** Kevin Thomason
**Cc:** Regina
**Subject:** Bencito Dirty Disk
**Attachments:** Bencito-073106.txt

Dirty disk, per your request.
Let me know if you need anything else. It was a pleasure working with you.

Jolyne Roberts
CSR #10823

DIRTY DISK

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JULIUS HUGHES, et al., )
)
Plaintiff, )
) District of Minnesota,
vs. ) MDL 1431,
) Case No. 02-0058
BAYER CORPORATION, et al., )
)
Defendant. )
)

DEPOSITION OF : ^ WITNAME
Taken by : ^ ATTY NAME, ^ ESQUIRE ^ ATTORNEY AT LAW
Commencing : ^ Time ^ A.M. ^ P.M.
Location : ^ Address, Suite ^
^ City, California ^ zip
Day, Date : ^ Day, ^ month, 2006
Reported by : JOLYNE K. ROBERTS, C.S.R. NO. 10823
Pursuant to : ^ Notice ^ Subpoena
Original to : ^ ATTY NAME, ^ ESQUIRE ^ ATTORNEY AT LAW

Pages 1 - ^

JOB NO. ^

DIRTY DISK

A There's a -- there are third party companies who would collect that.

Q Do you recall the name of any of those?

A No, I can't recall that.

Q When a sales associate would call on a doctor and would record their call into their database, which was subsequently synchronized with the one in west haven, what information would they put into that database?

A The date of the call; the number of samples that they had left; any relevant or pertinent discussion regarding the product.

Q So that's three items of information. Would there be additional information?

A Maybe the materials that the rep used in the presentation; if he has left some samples; file cards; what clinical paper, maybe, he has used in the presentation; maybe if the doctor has a question, he might record that, and how he answered that question.

Q I'm going to come back to a couple of these items in a minute, but I wanted to enter into evidence Plaintiff's Exhibit 1.

(Plaintiff's Exhibit No. ^ was marked for identification and is attached hereto.)

Q BY MR. THOMASON: This is an e-mail, which is

copies of letters or e-mails and informational ^ packets ^ pacts, did you bring any of those documents with you today?

A Yes.

Q Okay. May I see them?

MR. FRIEDMAN: I can represent, as he's giving these to you, that what he's giving you are document that's I gave him last week. They're copies of the P I's and the withdrawal letter.

MR. THOMASON: Okay.

If we can just take a five-minute.

MR. FRIEDMAN: Fine.

(Break in proceedings from ^ ^ A.M. ^ P.M. to ^ ^ A.M. ^ P.M.)

147 P.M. to 148 P.M..

MR. THOMASON: Back on the record.

Counsel, just so that we're clear, these documents which have Bates numbers on them were given from you to the deponent?

MR. FRIEDMAN: Yes.

Q BY MR. THOMASON: Mr. Bencito, do you have any other documents for the --

A No.

Q When you left the employ of Bayer, were you instructed to destroy all of your documents?

DIRTY DISK

A No, we were instructed to return all Bayer documents.

Q And did you return those via UPS?

A I don't recall. UPS or Fed Ex.

Q And about how many pages of documents did you return to Bayer?

A I don't recall.

Q Was it more than one box, banker's box?

A I just don't recall. I mean -- turned in my computer, laptop.

Q And it's my understanding that there's a federal law that requires the retention of records of any samples given to physicians. Are you aware of that law?

A Yes.

Q And I understand that it requires a three-year retention period for those. Is that right?

A I'm not sure about the three years.

Q Did Bayer have any sort of document retention policy?

A Yes.

Q What was their document retention policy?

A I'm not sure about the number of years, but they ininstructed us to retain or return all documents.

Q Retain or return?

A Take it back. Return all the documents, not

DIRTY DISK

retain.

Q And during your employ at Bayer, setting aside the request to return certain documents, was there also a policy for the retention of documents?

A Yes.

Q And do you know what that policy was?

A I have no recollection.

Q And when you returned all of your documents to Bayer at the end of your employ in late 2004, did you also return any notes that you may have made, handwritten notes?

A More than likely. I just don't recall what kind of documents I returned. It's been quite a while.

Q And, in fact, did they ask for you to return your handwritten notes?

A They did ask.

Q And is it fair to say that they asked you to return every single document that you had?

A Yes.

Q And did you, in fact, return ever single document that you had?

A To the best of my ability.

Q And did Bayer indicate to you that those documents would be destroyed?

A They did not say anything about what they were going to do with those documents.

use e-mail?

A For -- it's quicker to use the voicemail. Pharmaceutical reps are most of the day outside in the field. You can always check your voicemail as compared to e-mail you can check that maybe only once a day, early morning or maybe in the evening.

Q And during the period of 1999 do you have a sense of how many voicemail messages the reps might have gotten in a given week?

A From me or --

Q From Bayer, such as this (indicating)?

A I have no idea.

Q Would it have been more than one?

A More than one? Yeah, of course.

Q And did the sales reps, was there some sort of log sheet that they would sign to indicate that they heard a given voicemail message?

A No.

Q Was the text of the voicemail messages available on any of the Bayer databases or e-mail systems so that they could later go in and, say, review a message that they might have deleted?

A No.

Q Did you ever go on sales calls with any of the reps that you supervised?

A Yes.
Q And did you go on sales calls with Ross Delmendo?
A Yes.
MR. THOMASON: I'd like to enter into evidence plaintiff's 7.
(
^ Plaintiff's ^ Plaintiffs' ^ Petitioner's
Exhibit No. ^ was marked for
identification and is attached hereto.)
MR. THOMASON: This is a letter dated July 19, 2006, from our office to Mr. Bencito. If I could just ask you to read it over. Ask you if you've seen it before; and let me know when you're done reading.
MR. FRIEDMAN: Are you done?
THE WITNESS: Yeah.
MR. FRIEDMAN: Tell him.
THE WITNESS: Yeah, I'm done. I'm sorry.
MR. THOMASON: That's okay.
Q BY MR. THOMASON: Have you seen this letter before?
A Yes.
Q And if I could draw your attention to the very last paragraph of the letter where it says to bring any documents related to Bayer corporation, particularly any

# Exhibit 2

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In Re Baycol Products Litigation: | ) | MDL No. 1431 (MJD/JGL) |
| This Document Relates to: | ) | |
| Julius Hughes, | ) | Court File No. 02-0058 |
| Plaintiff, | ) | |
| BAYER CORPORATION, et al., | ) | |

DEPOSITION OF: ROSS DELMENDO

TAKEN ON: July 12, 2006

25553

ALTHEA L. MILLER

CSR No. 3353, RPR

11:58:37 you have to make a report regarding this physician? Perhaps some sort of notes?

A You mean insofar as making it -- in the way of transmitting it to -- to this particular
11:59:03 department?

Q Okay. Well, let's start generally.

Did you keep notes of your visits to these physicians in general?

A If we -- if we think that -- if I think
11:59:14 that, in my visit with the doctor, there is something that I need to put down as a note, then I would -- I would do it.

And, really, the -- the decision is -- is what I think is important or not important.

11:59:40 Q Uh-huh. Did you regularly, though, keep records of your visits?

A When you say "notes," you mean written -- written notes?

Q Well, yes.

12:00:00 A What I would -- what I would do, if ever there was a -- something that I feel is important for me to put down, I do it in my computer.

Q Did you have a laptop?

A Yes, I did.

12:00:15 Q Do you still have that laptop?

12:00:18 A Not anymore.
Q Do you know where it is now?
A I returned it to the company.
Q You returned it to the company?
12:00:25 Did you keep any handwritten notes?
A No.
Q Any journals?
A No.
Q Okay. So is it fair to say that, if you
12:00:33 had any notes, it would be on that laptop?
A Yes.
Q Did you report your visits to Bayer Corporation?
A Yes.
12:00:42 Q Okay. And what would you report?
A The name of the doctor. I would enter it in my -- in -- we have a -- the company uses a software where I can -- where I can enter the name of the doctor and the date and the -- the samples or
12:01:17 the products that I -- I talked about.
Q Uh-huh.
A And the samples that I left with the doctor, if I left a sample.
Q Okay. The amount of the samples too?
12:01:31 A And the number of the samples.

12:01:33 Q Do you know the name of the software or database?
A No.
Q You don't know? Okay. Did these reports
12:01:44 include summaries of your visits?
A What do you mean "summaries"?
Q Did you write some -- you know, for example, "I met with Dr. Jing and we discussed the following"?
12:02:02 A Not in all the -- not in every call.
Q Okay.
A As I mentioned, if there is something that I feel that is important that I need to put down, then I do put it down in my notes.
12:02:24 Q Okay. So you put it down in your notes on the laptop. How did you transmit that from your laptop to the company?
A We are asked to -- I use the word "synchronize."
12:02:37 Q Synchronize.
A We are instructed to synchronize.
Q Okay. Did you use any other software regarding submitting your reports regarding your visits to the physicians?
12:02:50 A No.

12:27:26 BY MR. NADJI:

Q Back on the record, please.

When you met with doctors in order to give your presentation regarding Baycol, did you meet

12:27:36 with them alone?

A Either in their office or within the confines of the medical office.

Q Okay. My question is did anyone else accompany you?

12:27:53 A Accompany me.

Q On these visits?

A On these visits?

Q Yes, sir.

A There was -- there were times when my

12:28:00 manager would accompany me.

Q Do you remember which one?

A Which one? Which manager?

Q Yes, sir.

A Both of them -- Mr. Bencito and

12:28:11 Mr. Johnston.

Q Okay. Did you have any assistants?

A Assistants?

Q On --

A In what way?

12:28:22 Q You said managers would sometimes accompany

12:28:24 you on these visits.
A Uh-huh.
Q Did anyone else accompany you on these visits aside from your managers?
12:28:30 A No.
Q So, for example, did you have any assistants that would accompany you on these visits?
A Assistants?
Q Yes, sir.
12:28:38 A My assistants?
Q Did you have any assistants?
A No.
Q How about other sales representatives?
A Other sales rep- -- no.
12:28:47 Q Okay. Do you know why your managers would accompany you on these visits?
A It's part of their job.
Q Okay. Would they be part of the presentation that you gave to these physicians?
12:29:06 A Sometimes they are.
Q Okay. And were they there to kind of see -- assess how well the job -- how good of a job that you're doing?
A I'd say yes.
12:29:21 Q Okay. Did you ever see physicians when

# Exhibit 3

**Kevin Thomason**

**From:** submit@kcscourtreporting.com
**Sent:** Tuesday, July 18, 2006 9:18 AM
**To:** Kevin Thomason; ymflaherty@locklaw.com; julie.hussey@dlapiper.com
**Subject:** 7/17/06: Andersen vs. Bayer Corp.
**Importance:** High
**Attachments:** horst-rt.txt

Dear Counsel:
Please find the requested rough draft in the above mentioned case matter.
If you should have difficulty opening this file, do not hesitate calling our office for assistance.

Neva Vazquez
KC's Court Reporting
Telephone (800) 266-1598
Fax (831) 373-1141

Check out our online scheduling at www.kcscourtreporting.com

THE WITNESS: Yes, I do.
BY MR. THOMASON:
Q. Good afternoon, Cheryl?
A. Good afternoon.
Q. How are you feeling today?
A. I feel good.
Q. Great. Please state your full name for the record?
A. Cheryl Stacey-Horst.
Q. And your date of birth?
A. 3-5-56.
Q. And have you gone by any other names?
A. Cheryl Stacy, or Cheryl Horst.
Q. And that was from a prior marriage?
A. No, maiden name is Stacy and I also never changed my name until I had my child, so I use all three.
Q. Have you ever been deposed before?
A. No.
Q. And have you ever testified in court?
A. Not -- no.
Q. You -- I sense a bit of hesitation there?
A. Well, I was thinking of traffic court when I've gone, but I've never testified.
Q. And when you've gone to traffic court was that

clinical communications or do a fax back.

Q. Okay.

MR. THOMASON: I'd like to go off the record for just a minute.

(Discussion off the record.)

BY MR. THOMASON:

Q. Okay. We're in the home stretch, Cheryl?

A. Okay.

Q. And I know after I'm done your attorney will have a few follow-up questions.

I'd like to enter into evidence plaintiff's.

THE REPORTER: 6.

MR. THOMASON: 6.

(Deposition Exhibit Number 6 was marked for identification.) And give you a copy.

BY MR. THOMASON:

Q. This document is entitled MACS Database Report, and there's a Bates number it says Bayer MDL, Rep 001678, and then it continues from there and ends on 001680. I'll represent that this was provided to plaintiff pursuant to PTL 149.

And Cheryl, have you had a chance to look at this?

A. Oh, yes.

Q. And have you ever seen anything like this before?

A. This is like call metrics.

Q. Call metrics? Was that the name of the program that you used?

A. No, that's just what I call it. I guess that's what we all call it, all the pharmaceutical industry. This is how many times we called on these reps.

Q. Yeah.

A. I mean we called on these physicians. Yeah.

Q. And if you could turn to what's marked page 2 of 3 and if I can call your attention to the upper portion of the page where it says rep information?

A. Uh-huh.

Q. Is that your name there?

A. Yes, it is.

Q. And it appears here, I'll represent, that there's various call dates starting on 9-24-99, going to 11-16-2000 on a Thomas Mustoe.

Do you recall calling on Doctor Thomas Mustoe?

A. I recall -- I don't recall specifically these dates, but I recall calling on them.

Q. And is it your recollection you called on him about once a month?

A. Yes.

Q. And is it safe to say that this is probably an accurate representation of when you actually called on him?

A. Yes.

Q. Did you ever call on a doctor and not enter it into your database?

A. I would definitely try not to, no, because I want to get credit for the call.

Q. So there's an incentive to make sure that you?

A. Yes.

Q. Enter a call into your database?

And do you have any sense of what the MACS at the top, M-A-C-S stands for.

A. Oh, that's our -- that was my system that I'm on. MACS.

Q. Is it an acronym?

A. No, it's -- yeah. Like we're a -- I'm using Prism. We used MACS.

Q. Does the CS stand for call system?

A. Maybe. I don't know.

Q. Okay. And this MACS system, if I can call your attention to the lower left corner of page 2, do you see a date down there at the very lower left corner?

A. Yes.

Q. Can you read that date into the record?

A. 4-27-2006.

Q. So would it be safe to say that this data was printed out on 4-27-2006?

A. Yes.

MS. HUSSEY: Object to form.

BY MR. THOMASON:

Q. What -- what other data did you enter into MACS?

A. Sample calls, whom we called on, and what we -- what we talked about. It would list the drugs and it would check off what you talked.

Q. What about call notes?

A. We could enter call notes if we wanted to.

Q. Well, unfortunately this is all the defendant gave us, however it appears --

A. Yeah, most reps don't take a whole bunch of call notes.

Q. Okay. But definitely on every call you -- you'd have to record what he oh what drug you talked about; is that --

A. Yeah.

Q. Okay. So it's not indicated here.

A. No.

Q. What other things would be put into the MACS system?

# Exhibit 4

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| In re: BAYCOL PRODUCTS LITIGATION | MDL No. 1431 (MJD/JGL) |
| This Document Relates to: | Court File No. 02-0058 |
| *Julius Hughes, et al. v. Bayer Corporation, et al.* | |

**PLAINTIFF JULIUS HUGHES' NOTICE OF MOTION AND MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS, WITNESSES AND ANSWERS TO INTERROGATORIES**

TO: ALL PARTIES AND THEIR COUNSEL OF RECORD

PLEASE TAKE NOTICE THAT, as soon as it may be heard by the Court, Plaintiff shall ask the Court to issue an order which, *inter alia*, requires Defendant Bayer Corporation to answer, without objection, Plaintiff's First Set of Interrogatories, and to provide all documents responsive to Plaintiff's First Set of Requests for Production of Documents. Plaintiff shall ask the Court to issue an order which requires Defendant to provide responses to said discovery without objection. Said Motion shall be based on papers filed along with this Notice, the accompanying Memorandum of Points and Authorities, any filings in this Court, as well as any other papers that may be submitted by Plaintiff as part of this Motion.

Dated: July 7, 2006

Respectfully submitted,

Original Signature on File with Filing Attorney.
Kevin L. Thomason
ALEXANDER, HAWES & AUDET, LLP
221 Main Street, Suite 1460
San Francisco, CA 94105
Telephone: 415.982.1776
Facsimile: 415.576.1776

*Attorneys for Plaintiff*

## PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

I am employed in the County of San Francisco, State of California; my business address is 221 Main Street, Suite 1460, San Francisco, California 94105. I am over the age of 18 and not a party to the within action. On this date a true and correct copy was electronically served on attorneys of record and liaison counsel:

**PLAINTIFF JULIUS HUGHES' NOTICE OF MOTION AND MOIOTN TO COMPEL THE PRODUCTION OF DOCUMENTS, WITNESSES AND ANSWERS TO INTERROGATORIES**

on the parties shown below:

*(See attached service list.)*

[ ] (BY FAX) I am readily familiar with the firm's practice of facsimile transmission; on this date the above-referenced documents were transmitted, the transmission was reported as complete and without error and the report was properly issued.

[ ] (BY MAIL) I am readily familiar with the firm's practice for the processing of mail; on this date, the above-referenced documents were placed for collection and delivery by the U.S. Postal Service following ordinary business practices.

[ ] (BY ELECTRONIC FILING) On this date I provided the documents(s) listed above electronically through the Court's electronic filing service provider pursuant to the instructions on that website.

[X] (BY E-MAIL) On this date, the above-referenced documents were converted to electronic files and e-mailed to the addresses shown.

[ ] Federal: I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on this 7th day of July, 2006, at San Francisco, California.

Original Signature on File with Filing Attorney.

Kenneth E. Friedman
Susan A. Weber
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles CA 90013
Telephone: 213.896.6000
Facsimile: 213.896.6600
kfriedman@sidley.com
sweber@sidley.com
baycoldps@sidley.com

Deanna D. Daily
LARSON KING
2800 Minnesota World Trade Center
30 East Seventh Street
St. Paul MN 55101
Telephone: 651.312.6500
Facsimile: 651.312.6618
ddaily@larsonking.com

Philip S. Beck
Adam Hoeflich
BARTLIT, BECK, HERMAN,
PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago IL 60610
Telephone: 312.494.4411
Facsimile: 312.494.4440
philip.beck@bartlit-beck.com
adam.hoeflich@bartlit-beck.com

Kathryn Connelly
Fred T. Magaziner
DECHERT LLP
4000 Bell Atlantic Tower
Philadelphia PA 19103-2793
Telephone: 215.994.4000
Facsimile: 215.994.2222
kathryn.connelly@dechert.com
fred.magaziner@dechert.com
baycoldep@dechert.com

Thomas Moore
Mario Horwitz
DRINKER BIDDLE & REATH LLP
333 South Grand Avenue, Suite 1700
Los Angeles CA 90071-1594
Telephone: 213.253.2300
Facsimile: 213.253.2301
thomas.moore@dbr.com
mario.horwitz@dbr.com