**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| In re: BAYCOL PRODUCTS LITIGATION | ) | MDL No. 1431 (MJD/JGL) |
| This Document Relates to: | ) | Case No. 02-0058 |
| *Julius Hughes, et al. v. Bayer AG, et al.* | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF JULIUS HUGHES' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND NON-OPPOSITION TO DEFENDANTS' MOTION TO DENY CLASS CERTIFICATION**

## INTRODUCTION

Defendants Bayer Corporation and Bayer AG ("Defendants") are not entitled to summary judgment as a matter of law. First, Defendants warnings of the specific risks associated with the taking of Baycol were inadequate, and because Defendants failed to fully disclose the known risks associated with Baycol the learned intermediary doctrine does not protect Defendants from liability. Secondly, summary judgment is not appropriate because Plaintiff Julius Hughes can establish that his injuries were caused by the ingestion of Baycol.

## STATEMENT OF FACTS

Baycol, the brand name for cerivastatin, is a statin, a class of drug commonly prescribed for high blood pressure and heart disease. *In re Baycol Products Liability Litig.*, MDL No. 1413, Pretrial Order No. 94, at 1-2 (D. Minn. Sept. 17, 2003)(hereinafter "PTO 94"). In 1997 the United States Food and Drug Administration ("FDA") approved Defendant Bayer's Application to Market a New Drug for Human Use ("NDA") for cerivastatin. Id. at 2. After approval, the Defendants began actively promoting the use of Baycol. Hughes Complaint p. 3. Baycol was

promoted as an effective medicine for reducing cholesterol, but studies that were submitted with the NDA confirmed that the only advantage of Baycol over other statins was its lower cost. Id.

Although all statins have, to a limited extent, the potential side effects of muscle weakness and myalgia, Baycol caused a significantly higher number of patients to experience these side effects. Id. Baycol was withdrawn from the consumer market in August 2001. PTO 94 at 1-2. At the time of Baycol's withdrawal, thirty-one deaths were linked to Baycol. Id. at 2. In addition to myalgia, Baycol has also been linked to rhabdomyolsis, myositis, and myopathy. Id.

**Plaintiff Julius Hughes' Background And Medical Condition**

Mr. Julius Hughes is a retired 75 year-old gentleman who has lived in the same residence, in a suburb of Los Angeles, since 1972 with his wife of 49 years, Christine Hughes. Julius Hughes Plaintiff's Fact Sheet at 2 (Ex A) ("PFS"). He is also the proud father of three children. Id. His hobbies include singing the blues, reading and writing for pleasure. Hughes Dep. (Ex B) at 16:6-17:1.

Medically speaking, Mr. Hughes has been relatively healthy with the exception of suffering from diabetes. PFS (Ex A) at 12; Jing Dep. (Ex E) at 15:6. At slightly taller than 6 feet tall, he has managed to keep his weight under 200 pounds. PFS (Ex A) at 7. More importantly, he has never smoked nor ever drank alcohol. PFS (Ex A) at 7-8; Hughes Dep. (Ex B) at 21:9-11. Mr. Hughes has managed to keep a healthy diet that his doctor told him to "stick with," which included lots of vegetables. Id. Prior to his injury, his exercise habits included walking 3 to 4 times a week. Id. at 48:2. He has been hospitalized only twice in his life, once in 1976 for a double hernia and other time for an eye operation in 1999. Id. at 36:12-25. Additionally, while taking Baycol, he was taken to the emergency room in 2001 by his son, Terry Hughes for severe

lower back pain. Id. at 38:2-6, 76:20.

Indeed, the severe lower back pain that Mr. Hughes experienced while he was on Baycol is the crux of Mr. Hughes's case. Mr. Hughes started taking Baycol 0.4 m.g. for elevated cholesterol (LDL cholesterol was 160) in March of 2001 and discontinued in August of that same year, with 18 pills remaining the pill bottle. Hughes Dep. (Ex B) at 61:21, 116:5; Jing Dep. (Ex E) 17:11-13. When Mr. Hughes started taking Baycol he read the brochure and consulted with Dr. Jing. Id. at 60:13-16. Dr. Jing told him that "'This is a new drug. I'm going to try you out on it for a while.'" Id. As for the brochure, as Mr. Hughes said "I read it enough to know that it had its ups and downs." Id. Neither Mr. Hughes nor Dr. Jing knew at that time Mr. Hughes would experience <u>one of the worst pains that he had ever felt</u> in his lower back:

> Q. On a scale of 1 to 10, with 10 being the most painful and 1 being the least painful, how would you rate your lower back pain?
>
> ….
>
> A. **I would say 10 at the time**.

Hughes Dep. (Ex B) at 69:16 (emphasis added).

Indeed, if either Mr. Hughes or Dr. Jing knew that would have suffered such severe pain, Mr. would not have taken Baycol, but would have taken another cholesterol lowering drug without the same side effects. Furthermore, a medical expert was retained to opine on Mr. Hughes's medical condition. Steve Trobiani, M.D., Case Specific Expert Report Pursuant to PTO 114 (Ex C) ("Trobiani Expert Report"). Among other things, Dr. Trobiani stated that based on examining Mr. Hughes's medical records, Mr. Hughes suffered myalgia due to his ingestion of Baycol. Case Specific Expert Report at 2.

# ARGUMENT

## I. STANDARD OF REVIEW

Because this is a diversity action, the reviewing court must apply California substantive law and federal rules of procedure. *See Motus v. Pfizer, Inc.*, 358 F.3d 659 (9th Cir. 2004). The judge's duty at the summary judgment stage is not to weigh the evidence himself and determine the truth of the matter, but rather to determine whether there is a genuine factual issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Summary judgment is proper only where the "pleadings, Depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Under Fed. R. Civ. P. 56, summary judgment can only be granted when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact. *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir. 1997). Any doubts concerning the appropriateness of granting a summary judgment motion must be resolved in favor of the party opposing the motion. *Johnson v. Superior Court,* 143 Cal.App.4th 297, 304 (2006) (citing *Kolodge v. Boyd*, 88 Cal.App.4th 349, 355 (2001)). Summary judgment is improper unless the moving party can negate every alternative theory of liability and as such, tort actions are not generally disposed of by summary judgment. *Hufft v. Horowitz,* 4 Cal.App. 4th 8, 32 (1992).

In California, Rule 56 is to be read with Cal. Code Civ. Proc. § 437c, subd. (c) which allows the trial court ruling on the motion to consider all evidence and all the inferences reasonably deducible from the evidence set forth in the papers, "except summary judgment shall not be granted by the court based on inferences reasonably deducible from the evidence, if

contradicted by other inferences or evidence, which raise a triable issue as to any material fact." Cal. Code Civ. Proc. § 437c, subd. (c); *Clark v. Baxter Healthcare Corp.*, 83 Cal.App.4th 1048, 1054 (2000).

Thus, Courts must abide by the strong public policy favoring disposition on the merits over judicial efficiency because summary judgment is such an extreme measure which would deprive the losing party of a trial on the merits of the claim. *Johnson,* 143 Cal.App.4th at 304 (citing *Bahl v. Bank of Am.*, 89 Cal.App.4th 389, 398 (2001)).

## II. HUGHES' CLAIMS ARE ACTIONABLE BECAUSE THE WARNINGS BAYCOL PROVIDED FAILED TO ADEQUATELY WARN HUGHES OR HIS PRESCRIBING PHYSICIAN OF THE DANGERS OF BAYCOL

Hughes' claims should not be summarily dismissed because Defendants failed to adequately warn Plaintiff of the risks associated with Baycol. Because Hughes's prescribing physician was not provided adequate warnings, he was not aware of the relevant risks associated with Baycol and therefore the learned intermediary doctrine is inapplicable le to this case.

### A. Defendants cannot shield themselves behind the learned intermediate doctrine because they failed to adequately warn doctors of the potential side effects associated with Baycol.

California law specifically shields prescription drug manufacturers excerpts from liability when <u>adequate</u> warning has been given to physicians about the potential dangers of the medication. *Carlin v. Superior Court*, 13 Cal.4th 1104, 1110 (1996) (finding that manufacturers of prescription drugs can be held strictly liable for a failure to warn). The drug manufacturer can satisfy its duty by providing an appropriate warning concerning the drug's risks when it informs the patient's physician of the specific risk and dangers. *Brown v. Superior Court,* 44 Cal.3 1049, 10061-62; *Carmichael v. Reitz,* 17 Cal.App.3d 958, 989 (1971). When the dangers of the drug are scientifically foreseeable to the manufacturer, but the physician is not warned, liability may

still extend to the manufacturer. *Carlin,* 13 Cal.4th at 1110. California courts have specifically stated that when a prescription drug is place upon the market and sold without adequate and proper warning of a known risk, a manufacturer may be held strictly liable for the resulting injury. *Carmichael*, 17 Cal.App. 3d at 988. Therefore, although the learned intermediary doctrine can provide a defense in certain instances, a manufacturer cannot avoid liability unless it has supplied appropriate warnings to the physician. *Carlin,* 13 Cal. 4th at 1116.

In addition to inadequate warnings a manufacturer may also be held liable for the complete lack of a warning. *McKinney v. Revlon, Inc.*, 2 Cal.App.4th 602, 608 n.4 (1992). Even if the drug manufacturer is in compliance with regulations as to the warning label, it "may not be sufficient to immunize the manufacturer" of the drug from liability. *Stevens v. Parke, Davis & Co.*, 9 Cal.3d 51, 65 (finding that if a manufacturer knows or has reason to know of a greater danger not included in the warning, its duty to warn may not be fulfilled).

The "pivotal issue" then becomes whether an adequate warning was provided to the prescribing physician. *Cox v. Deputy Motech, Inc*., 95-CV-3848-L(JA) 2000 U.S. Dist. LEXIS 22849 at *24(S.D. Cal. March 29, 2000).

Under the facts of this case, a jury could reasonably conclude that the Defendants' various warnings were inadequate due to the dearth of negative information concerning Baycol which was withheld from or misrepresented to prescribing physicians, the public at large, and the FDA. The Defendants' warnings were not adequate in large part because of what the warnings did not reveal. At the very least, a variety of documents produced by the Defendants create a factual issue as to whether the Defendants adequately warned physicians about the negative effects of Baycol use. The documents provided the Defendants demonstrate that Defendants

withheld and misrepresented significant information concerning Baycol's efficacy, potential risks, adverse reports, and various side effects.

Mr. Hughes's prescribing physician was not adequately informed of the dangers associated with Baycol. Dr. Jing stated that: "Most of the medications that I prescribe I'm very familiar with, and I don't' need to do that. If it's a mediation that I don't use a lot, then the answer is I do." Jing Dep. (Ex. E) at 53:4-7. Furthermore, with respect to Baycol he did not recollect that he reviewed the PDR nor the package insert before he prescribed to Mr. Hughes. Id. at 54:23; 58:3-7. He did in fact, however, rely on materials and literature that were provided by pharmaceutical representatives, including Defendants. Id. at 57:10-16; 58:11; 59:8-11.

Unfortunately, Defendants were not completely upfront to doctors with the results from the clinical trials of Baycol and decided to "cherry pick" data from studies and incorporate unapproved doses into promotional pieces. When asked whether he remembers Baycol representatives giving him warnings regarding myopathy and myalgia, he answered: <u>No</u>. Id. at 60:20; 61:1. Furthermore, Dr. Jing does not recall being told by Bayer Representatives that clinical trials regarding Baycol had been stopped before the planned end nor did her remember being told about FDA actions taken relative to those claims that Baycol was more effective because of its synthetic properties. Id. at 63:21; 64:10.

Not simply these facts, but also Dr. Jing was <u>not able to recall</u> a multitude of information that <u>should have been</u> given to him by Bayer Representative:

- Of protocols relative to increased CK levels. Id. at 64:18.
- Of clinical trials for Baycol demonstrating rhabdomyolysis. Id. at 65:6.
- Of reports of rhabdomyolysis incidents to the FDA were ten times higher as compared to Lipitor. Id. at 66:1.

- Of the rate reports of rhabomyolysis to the FDA was 40 times higher for Baycol as compared to Pravachol. Id. at 66:20.
- That Baycol received a black box warning. Id. at 68:18.
- That Baycol had been discontinued. Id. at 69:21.
- <u>That the rates of myalgia were higher for Baycol than for other comparable statins</u>. Id. at 73:3.

Had Defendants adequately informed Dr. Jing of the differing rate of adverse events associated with Baycol compared to other pharmaceutical products on the market, he would have "certainly" looked at it more carefully. Id. at 65:14-18. In fact, Dr. Jing wisely stated: "I mean, I think that any meaningful data that shows one drug which is comparable has a greater risk than other drugs would certainly make me consider whether I want to prescribe that drug very carefully or not." Id. at 66:9-13; 67:3-22.

Here, even if the physician was aware of the general risks associated with Baycol, it would not relieve Defendants of their duty because a specific warning is required. *Anderson v. Owens-Corning Fiberglas Corp.*, 53 Cal. 3d 987, 1007 (1991). Since Dr. Jing was not adequately informed by the Defendants of Baycol's potential side effects, Defendants cannot now claim that they are immune from liability.

During the time that Baycol was on the market, Defendants had a legal duty to adequately warn physicians of the risk associated with its use. Although the Defendants issued certain warnings with regard to Baycol, genuine issues of fact remain as to whether the Defendants provided adequate warning regarding the negative side effects associated with Baycol. Whether the manufacturer provided an adequate warning is a factual issue to be determined by the jury. Ultimately, the learned intermediary doctrine is not applicable because the prescribing physician

was never apprised by Defendants to the full extent of the possible dangers associated with Baycol.

**B. The Defendants Over-Promotion of Baycol to the Prescribing Physician and Insurance Companies Negates Any Warning**

Even if the Court finds that the Defendants provided an adequate warning to the plaintiff, which they did not, or that the prescribing physician knew of the relevant risks associated with Baycol, the continuous over-promotion of Baycol to the medical profession erodes, and actually nullifies any warnings. *See Stevens*, 9 Cal.3d 51 (1973) (finding a manufacturer is not relieved of liability where it is reasonably foreseeable that the physician would be "consciously or subconsciously" persuaded to prescribe the drug even though it was not warranted). "[I]f the [drug] manufacturer negligently over-promotes its products, or downplays [its] dangerous effect" the manufacturer cannot be relieved of liability and the resulting injuries. *Evraets v. Intermedics Intraocular, Inc*., 29 Cal.App. 4th 779 (1994).

Mr. Hughes recalled reading the brochure for Baycol, however did not recall reading that he would experience one of the worst pains in his life. Hughes Dep. (Ex B) at 60:13-16. While the prescribing physician may have been cognizant of the general dangers associated with Baycol, Dr. Jing was deliberately induced into prescribing Baycol even though it was not warranted. *See Stevens*, 9 Cal.3d. at 69 (finding that the drug manufacturer cannot be relieved of liability, if it was reasonably foreseeable that physicians, despite the awareness of the general dangers of the drug, still prescribe it to their patients). As the court opined in *Stevens*, the drug manufacturer cannot be relieved of its liability because of the foreseeable intervening act of the prescribing doctor in prescribing the drug, while knowing of its dangerous propensities. *Stevens*, 9 Cal.3d at 69. The dangers were glossed over by Defendants while over-promoting Baycol

because they were attempting to 'maximize sales results' of Baycol which were needed to carry the company for the short and long haul.

Indeed, during Dr. Jing's Deposition, a series of questions were asked on this specific issue:

> Q Had you been aware of the fact that Baycol represented an increased risk for myopathy, myalgia, or rhabomyolysis as compared to other statins, would that have affected your view of the Baycol safety profile?
>
> …
>
> A <u>Again, if a mediation which comparable to others has a greater risk, it certainly does affect my prescribing that medication</u>.
>
> Q How important is it to you that sales representatives from any drug company provide you with an accurate list of risks associated with any drug that you prescribe to your patients?
>
> …
>
> A Its very important that any pharmaceutical representative provide as complete as picture of a medication as possible that indicates both the risks and benefits.
>
> …

> Q Is it your understanding now [after discontinuation] that Baycol has higher rate of adverse events and, therefore, has somewhat of a distinguishable safety profile from other statins?
>
> …
>
> A It's my general knowledge that that is the case.
>
> …
>
> Q Had you known that at the time you prescribed – had you know that back in March 2001, would you have prescribed Baycol to Mr. Hughes?
>
> …
>
> A Again, if I'm aware that a comparable medication has a higher risk for the patient, then that certainly does affect my prescribing pattern.

Jing Dep. (Ex E) at 73:6-23; 76:20-77:9 (emphasis provided).

In fact, when asked whether he remembers receiving literature indicating that Baycol was superior compared to other statins, Dr. Jing specifically answered: yes. Jing Dep. (Ex E) at 63:4-13. Thus, if there is any doubt as to whether the intervening act of the prescribing doctor in prescribing the Baycol was reasonably foreseeable, then the question is properly left to the jury. *Stevens*, 9 Cal.3d at 69 (referencing *McEvoy v. Am. Pool Corp.*, 32 Cal.2d 295 (1948)).

### C. An Adequate Warning Concerning the Dangers of Baycol Would Have Prevented Hughes's Injuries.

Mr. Hughes trusted his doctors and relied on Dr. Jing and his medical advice in prescribing Baycol. Hughes Dep. (Ex B) at 60:13-16. Unfortunately, the prescribing doctor, who Hughes relied on, was never given complete disclosure by the Defendants of Baycol's side effects. Dr. Jing prescribed Baycol to Hughes in March 2001. Jing Dep. (Ex E) at 18:1. In prescribing Baycol, Dr. Jing relied on the information and literature about possible side effects provided to him. Id. at 57:10-18. When Dr. Jing prescribed Baycol to Hughes he did not believe that the risks of myalgia was any greater with Baycol than any other statin. Id. at 73:3.

Information about rates of myalgia in patients was the type of information that he would have taken into account when deciding which medicine to prescribe. Id. 73:6-23. Dr. Jing never indicated that had he had more complete knowledge about the risks of Baycol, he would have still prescribed Baycol to Plaintiff Hughes. Rather, Dr. Jing suggested that the information that was withheld from him by the Defendants was the type of information that he would normally take into account when determining whether or not to prescribe medicine to a patient.

As Dr. Jing's Deposition suggests, the Defendants made certain, through their inadequate warnings, that Dr. Jing was not an informed intermediary when it came to prescribing Baycol to Plaintiff Hughes. Based on the facts presented, a reasonable jury could conclude that had Dr. Jing had the complete facts regarding the efficacy and safety of Baycol, he may not have prescribed it to Plaintiff Hughes. Therefore summary judgment is not appropriate under the learned intermediary doctrine.

### D. Plaintiff Hughes Can Establish Medical Causation.

Contrary to the Defendants assertion, Mr. Hughes's expert need not rule out all possible alternative causes of Mr. Hughes's injury. Rather, Mr. Hughes need only establish a link

between the alleged defect and the injury sufficient to allow the jury to conclude that the defect caused his injury. This is precisely what has occurred here. While Mr. Hughes's expert, Steven Trobiani, M.D., admitted that Mr. Hughes's dark urination was possibly due to dehydration, Mr. Hughes has presented sufficient evidence to at the very least create an issue of fact that should be presented to the jury.

Dr. Trobiani, as an expert in this case, has determined that Hughes suffered from Myalgia as a result of his ingestion of Baycol. Trobiani Expert Report (Ex C); Trobiani Dep. (Ex D) at 11:17-20. Dr. Trobiani based his opinion on Hughes's injuries on his examination of Hughes's medical records, stating that "[A] claim exists in the medical record based on the development of the symptoms that [Mr. Hughes] had." Trobiani Expert Report (Ex C); Trobiani Dep. (Ex D) at 12:9-12. Dr. Trobiani based his conclusion that Hughes had suffered myalgia on a host of factors, which included feeling pain the lower back region, which "was gone as soon as the mediation was discontinued." Trobiani Expert Report (Ex C); Trobiani Dep. (Ex D) at 13:14-16; 15:21-23. Lastly, Dr. Trobiani directly attributes the discontinuation of the use of Baycol, as ordered Mr. Hughes's physician, because Mr. Hughes's lower back pain. Trobiani Dep. (Ex D) at 18:1.

Although the Defendants have argued that myalgia cannot be established because Hughes's CK level was not elevated, Defendants' own expert, Dr. Daniel Rovner, noted that elevated CK levels do not necessarily rule out a causal connection. Rovner Dep. (Ex F) at 43:16-44:14. Furthermore, and in agreement with Plaintiff's position, Dr. Rovner opined that "myalgia could be attributed to statins." Id. at 18:20. Similarly to Dr. Trobiani, Dr. Rovner primarily relied on Plaintiff's medical records in formulating his opinion. Id. at 29:9. Specifically, Dr. Rovner formulated his opinion in the medical record was the absence of persisting complaints

and evidence of myopathy. Id. at 29:12-19. In a subsequent inconsistent statement, he said that it is possible to have myalgia without myopathy. Id. at 39:24. He stated: "[I]f a patient had complained of myalgias for instance for over months and months and months, certainly a statin-based myalgia would have to be a consideration." Id. at 30:4-7. He further added it in his experience it takes anywhere from 4 to 8 weeks for a statin myalgia to disappear. Id. at 21-23. Indeed, both Mr. Hughes and Mrs. Hughes testified that it took 'some time' for the pain to dissipate. Christine Dep. (Ex G) at 38:11-21.

To the extent that the Defendants argue that the Court need not resolve the issue of whether Baycol was the medical cause of myalgia in Mr. Hughes because Dr. Jing was aware of the possibility of this type of muscle injury, this argument is incorrect. Therefore, because a reasonable jury, if presented with the evidence described above, could conclude that Baycol caused Hughes's myalgia, summary judgment is not appropriate.

As for "specific causation," when viewing the evidence in a light most favorable to the Plaintiff, a jury could conclude that Baycol caused Plaintiff's myalgia during the time. Plaintiff's expert, Dr. Trobiani, evaluated Plaintiff's medical records and concluded that he suffered or injuries related to his ingestion of Baycol. Because of evidence of causation exists in the record, summary judgment in favor of the Defendants is not appropriate.

Accordingly, summary judgment is not warranted on any of the plaintiff's claims.

## CONCLUSION

For all of the foregoing reasons, plaintiff Julius Hughes respectfully requests that this Court enter an order denying Defendants' motion for summary judgment. Plaintiff further requests oral argument.

Dated: January 25, 2008

AUDET & PARTNERS, LLP

/signature on file/
Kevin L. Thomason

William M. Audet
Adel A. Nadji
221 Main Street, Suite 1460
San Francisco, CA 94105
Telephone: 415.568.2555
Facsimile: 415.568.2556

*Attorneys for Plaintiff*

CERTIFICATE OF SERVICE

I, Kevin L. Thomason, certify that true and correct copies of the foregoing Memorandum of Law in Support of Plaintiff Julius Hughes' Opposition to Defendants' Motion for Summary Judgment and Non-Opposition to Defendants' Motion To Deny Class Certification, Affidavit of Kevin L. Thomason, Local Rule 7.1 certificate, and exhibits were electronically filed and served on January 25, 2008.

______________________________

CERTIFICATE OF SERVICE

I, Kevin L. Thomason, certify that true and correct copies of the foregoing Memorandum of Law in Support of Plaintiff Julius Hughes' Opposition to Defendants' Motion for Summary Judgment and Non-Opposition to Defendants' Motion To Deny Class Certification, Affidavit of Kevin L. Thomason, Local Rule 7.1 certificate, and exhibits were electronically filed and served on January 25, 2008.