# EXHIBIT D

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

:

IN RE BAYCOL PRODUCTS LITIGATION : MDL NO. 1431

: (MJD)

THIS DOCUMENT RELATES TO: :

:

JULIUS HUGHES V. BAYER A.G., ET AL. : CASE NO.

: 02-CV-0058

:

VOLUME V

DEPOSITION OF STEVEN TROBIANI, M.D.

SEPTEMBER 13, 2006

11:10 A.M.

REPORTED BY: HART ERICKSON

ERICKSON COURT REPORTING

2902 KEATING CIRCLE

BURNSVILLE, MINNESOTA 55337

PHONE: 952.890.0265 * FAX: 952.426.2265

Q. Exhibit 32, which contains the medical records, is in a file jacket. Are the medical records that are in that file jacket in the format in which they were sent to you?
A. Yes.
Q. And who sent them to you?
A. I believe they were sent to me by the Lockridge firm.
Q. When were they sent to you?
A. I don't know.
MS. FLAHERTY: Actually, counsel, I can represent to you that they were not. You can ask him that, but I just want to make sure you have a clear record on this. The Lockridge firm does not represent Mr. Hughes. I mean, I am for purposes of today's deposition, but --
THE WITNESS: This is one that was sent from California, and this is obviously one of those, and I can't remember the name of the firm that sent this.
MS. FLAHERTY: I have it if you want it.
BY MS. BARRAD:
Q. Would that firm be Alexander & Audet? If you know.

Hughes took Baycol?
A. It's my opinion he took it between March of 2001 and August of 2001.
Q. Do you have an opinion as to what day he started taking Baycol in March 2001?
A. No.
Q. Do you have an opinion as to what day he stopped taking Baycol in August of 2001?
A. August 24, apparently.
Q. So it's your opinion that he took Baycol from sometime in March 2001 until August 24, 2001; is that correct?
A. Yes.
Q. Do you have an opinion as to whether or not Julius Hughes suffered an injury due to his use of Baycol?
A. Yes.
Q. What is that opinion?
A. It's my opinion that he suffered from myalgia secondary to the use of Baycol.
Q. And I believe earlier in your deposition you testified that myalgia means muscle pain; is that correct?
A. Yes.
Q. And it does not include muscle weakness, correct?

A. That's correct.
Q. In paragraph 6 a. it states there is a claim of injury as described above in the patient's medical record.
By this phraseology, are you stating that the basis for your opinion is the fact that Mr. Hughes claimed and it was recorded in his medical record that he claimed to be injured?
A. No. What I'm stating here is that not that he claimed, but the claim exists in the medical record based upon the development of the symptoms that he had.
Q. So in paragraph 4 a., the second sentence reads, "On August 24, 2001, he was seen," and "he" meaning Julius Hughes, "was seen with a complaint of lower back pain for one week with turning over. He also complained of dark urine."
Is this the claim of injury that you're referring to in paragraph 6 a.?
A. Yes.
Q. Which medical records support this claim of injury?
A. The medical records from that date, the date of August 24, 2001.

(Deposition Exhibit Number 33 marked
for identification.)
BY MS. BARRAD:
Q. I've marked as Exhibit 33 a medical record dated
August 24, 2001, relating to Julius Hughes. Is
this the record to which you were referring?
A. Yes, it is.
Q. Is there anything other than this medical record
that constitutes the claim of injury in his
medical record?
A. No.
Q. What is your understanding of what you mean by
"lower back pain for one week with turning over"?
A. It's my understanding that primarily when he would
turn over in bed, he had pain in his lower back
and that had been persisting for a week.
Q. Is it your understanding that the pain in his
lower back occurred at any time other than when he
was turning over in bed?
A. I don't have any understanding other than that.
Q. So your opinion relating to his lower back pain is
that it occurred when he was in bed and would turn
over, but that you have no opinion as to whether
he had lower back pain at any other time; is that
correct?

A. I have no record that tells me that.
Q. So it's your opinion, then, that -- or let me back up.
You are not opining as to whether he had lower back pain at any time other than when he was in bed and turning over; is that correct?
A. That's correct.
Q. Do you have an opinion as to when he started to feel this back pain?
A. A week before he presented on August 24. He states that it was present for one week.
Q. So it's your opinion that his back pain started approximately August 17, 2001?
A. Approximately, yes.
Q. Is there any evidence in any of his medical records prior to August 24, 2001, that Julius Hughes suffered from lower back pain?
A. Not that I recall reading.
(Deposition Exhibit Number 34 marked for identification.)
BY MS. BARRAD:
Q. I've marked as Deposition Exhibit Number 34 a medical record dated June 12, 2001. This is a record of Julius Hughes's visit to Dr. Jing on June 12, 2001, correct?

A. Okay.
Q. Is there anything in this medical record that suggests that he was suffering from lower back pain?
A. No.
Q. So it's your opinion that he was not suffering from lower back pain as of June 12, 2001, correct?
A. Not that I can tell here.
Q. And in fact, you don't have any opinion that he was suffering from lower back pain before approximately August 17, 2001, correct?
A. Correct.
Q. How long did Mr. Hughes's lower back pain last?
MS. FLAHERTY: Object to the form. I think it's been asked and answered, but go ahead.
MS. BARRAD: Let me restate the question.
BY MS. BARRAD:
Q. For how long after August 24, 2001, did Mr. Hughes suffer from lower back pain?
A. I don't know. It does not appear to have been long. The indication is the back pain was gone as soon as the medication was discontinued.
Q. And you previously testified that Mr. Hughes stopped taking Baycol as of August 24, 2001,

myoglobinuria, and the dark urine consequently has nothing to do with the ingestion of Baycol.

Q. So your opinion is that his dark urine was caused by something other than Baycol, correct?

A. Dehydration would be all that would be necessary for that.

Q. Paragraph 6 e. of your report, Deposition Exhibit 31, reads, "The described injury did not grow worse after Baycol was removed. The lower back pain did, in fact, improve."

And you have stated it's your opinion that his lower back pain improved upon stoppage of the medication, correct?

A. Yes.

Q. Do you have any opinion that Mr. Hughes suffered pain anywhere other than in his lower back?

A. No.

Q. And you're not offering the opinion that he suffered from rhabdomyolysis in August of 2001, correct?

A. No. Well, let me clarify that. Yes, that's correct. No, I am not offering that opinion.

Q. Thank you. Is it your opinion that the treating physician discontinued the use of Baycol because of Mr. Hughes's lower back pain?

A. Yes.
Q. Is there any support in the medical record for that opinion?
A. Yes.
Q. And what is that support?
A. The record simply states that he has one week of lower back pain with turning over. Also, urine dark for about a week. He orders a CK, which is appropriate; he orders a urinalysis, which is appropriate; and he discontinues Baycol, which would be the logical thing to do at the same time and he changes him to a different statin. He places him on Lescol.
Q. Do you have any knowledge about when Baycol was withdrawn from the market?
A. I do. It was withdrawn in August. He would have had to make the change anyway, but the way the record is laid out, it appears that he's relating the need to do so not only to the withdrawal of the drug from the market but to the symptoms that the patient complained of.
Q. So it's your interpretation of the medical record that leads you to your opinion that the doctor took Mr. Hughes off of Baycol and put him on to Lescol because of the lower back pain; is that

BY MS. BARRAD:
Q. Are you offering any opinion that Julius Hughes is not an appropriate candidate for statin therapy?
MS. FLAHERTY: Object to the form.
A. Same opinion as I expressed before. Before statin therapy is instituted, the NIH protocol is six weeks of diet and exercise followed by six weeks of plant sterols. I don't have any indication that either was tried before the drugs were implemented.
BY MS. BARRAD:
Q. Is there anything about Mr. Hughes's medical history or condition that would suggest that he should not have been on a statin medication?
A. No.
Q. Are you offering an opinion that Julius Hughes requires ongoing medical follow-up for any Baycol-related injury?
A. No.
Q. Are you offering any opinion that Mr. Hughes is at risk of developing a Baycol-related injury sometime in the future?
A. No.
MS. BARRAD: GSK, do you have any questions?

MS. ARNESE: No, I did not.

MS. FLAHERTY: Just two questions, Doctor.

EXAMINATION

BY MS. FLAHERTY:

Q. The opinions set forth in your report regarding Mr. Julius Hughes, are those opinions set forth to a reasonable degree of medical certainty?

A. Yes.

Q. And with regard to any opinions expressed in today's deposition, Doctor, have you expressed those opinions to a reasonable degree of medical certainty?

A. Yes.

MS. FLAHERTY: I do not have any additional questions for him.

MS. BARRAD: Okay.

(Deposition concluded at 11:35 a.m.)