# EXHIBIT E

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| In re BAYCOL PRODUCTS LITIGATION | MDL No. 1431 (MJD) |
| THIS DOCUMENT RELATES TO: | CASE No. 02-0058 |
| Julius Hughes, et al., v. Bayer Corp, et al., | |

DEPOSITION OF RAYMOND JING, M.D.,

HAWTHORNE, CALIFORNIA

WEDNESDAY, JULY 19, 2006

Reported by:

ANGELA GINEVAN, CSR No. 12124, RPR

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| In re BAYCOL PRODUCTS LITIGATION ) | MDL No. 1431 (MJD) |
| THIS DOCUMENT RELATES TO: ) | CASE No. 02-0058 |
| Julius Hughes, et al., v. Bayer Corp, et al., ) | |

Deposition of RAYMOND JING, M.D., taken on behalf of Defendant Bayer Corporation, at 11539 South Hawthorne Boulevard, Sixth Floor, Hawthorne, California, commencing at 9:07 A.M., Wednesday, July 19, 2006, before Angela Ginevan, CSR No. 12124, RPR.

APPEARANCES:

FOR THE PLAINTIFF JULIUS HUGHES:

ALEXANDER HAWES & AUDET, LLP
BY: JOSHUA C. EZRIN, ESQ.
221 Main Street
Suite 1460
San Francisco, California 94105
(415) 982-1776

FOR THE DEFENDANT BAYER CORPORATION:

SIDLEY AUSTIN LLP
BY: NITIN REDDY, ESQ.
555 West Fifth Street
Suite 4000
Los Angeles, California 90013
(213) 896-6000

I N D E X



| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| RAYMOND JING, M.D. | BY MR. REDDY | 5, 77 |
| | BY MR. EZRIN | 53 |



EXHIBITS



| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Subpoena | 7 |
| 2 | Medical records, Bates stamped Documents AMG000003 through AMG000060 | 10 |

BY MR. REDDY:

Q. As you're -- how are these records kept?

A. Well, when we see the patient, you know, back when Mr. Hughes first came here, we had a paper chart. So when the patient comes in, we have a blank progress note, and the doctor either enters the information while he or she is seeing the patient or might enter it after the patient leaves.

With electronic medical records, generally speaking, I enter after the patient leaves because it's hard to sort of bring -- it's hard to bring the computer into the room.

Q. And do you do it soon after the patient leaves?

A. I do, yes.

Q. And that's your practice?

A. Yes.

Q. And do you enter the information yourself, or do you dictate it into the system?

A. I enter it myself.

Q. Okay. Do you make every effort to write down all the major complaints that the patient has given you?

A. Yes.

MR. EZRIN: Object to form.

BY MR. REDDY:

Q. Do you try to write down all of the major

complaints that the patients have --

A. I do try to.

MR. EZRIN: Same objection.

THE COURT REPORTER: Hold on.

MR. EZRIN: You know what, maybe if you could, just pause briefly before you answer so I can interject an objection, if necessary, and I don't want to step over what you're saying. The court reporter's got to take it down. So --

THE WITNESS: Okay.

MR. EZRIN: -- periodically I'll be making objections, and I'll try to do it as unobtrusively as possible.

THE WITNESS: Okay.

BY MR. REDDY:

Q. When did you first see Mr. Hughes?

I think I can refer you to page 46.

A. My first visit was March 6th, 2001.

Q. And had Mr. Hughes been seen by anyone else at Axminster prior to that?

A. Yes.

Q. And who had he seen?

A. He saw another internist on January 10th, 2001.

Q. And prior to January 10th, 2001, did Mr. Hughes see anyone outside Axminster?

A. I don't know.
Q. Okay. So as far as you know, the first visit he had with anyone at Axminster was January 10th, 2001?
A. Yes.
These are out of order, the progress notes.
Q. Okay.
A. So it may take just a few minutes for me to -- or a few seconds for me to get back to the chart because, you know, some of the 2003 visits are, you know, before the 2001 visits, and then some 2003 visits that are elsewhere in the chart.
Q. Okay. Sure. Like I said, if you want to use your own chart, that's fine, and we can just talk about what the note says on it so that way we can all just make sure we're on the same page.
A. Okay.
Q. Now, how did you first come to see Mr. Hughes?
A. He came to see me for routine office visit.
Q. So was he referred to you?
A. No.
Q. Do you know who his doctor was prior to you?
A. I do not.
Q. Was there anything significant about Mr. Hughes' medical history at -- that he told you at this time?

MR. EZRIN: Object to form.

THE WITNESS: Yes. Mr. Hughes had hyper- -- had diabetes.

BY MR. REDDY:

Q. What type of diabetes did Mr. Hughes have?

A. He has Type-II diabetes.

Q. What's the difference?

A. Type-II diabetes means that he is not insulin dependent.

Q. Did you recommend any course of treatment for Mr. Hughes at this office visit in March of 2001?

MR. EZRIN: Object to form.

THE WITNESS: I continued his hypertension medicine and did diagnostic workup on him.

BY MR. REDDY:

Q. And what hypertension medicine was he taking?

A. He was taking Lotensin.

Q. Do you know the dosage?

A. It was 10 milligrams daily.

Q. And what did you do as part of your diagnostic workup?

A. He had some blood tests done, he was referred to an eye doctor, and he was referred to a podiatrist.

Q. And what blood tests did you do?

A. He had a complete blood count, a chemistry

panel, a lipid panel, a urine test for microalbumin.

Q. And why did you do these tests?

A. You know, these are routine tests that we do on diabetics.

Q. So Mr. Hughes had already been diagnosed as a diabetic prior to this time?

A. Yes, he had been.

Q. And was he on any sort of diabetic -- diabetes medicine at that time?

A. Yes. He was taking Humulin N insulin.

Q. Is that a porcine insulin or a --

A. No. It's a -- there's -- it's not -- porcine is from animals. Yeah. This is human insulin that's manufactured genetically.

Q. Okay. Now, earlier we'd spoken about the cardiovascular risk factors.

A. Yes.

Q. And I think you had mentioned smoking, hypertension, high cholesterol, and diabetes as being the primary cardiac risk factors; is that correct?

A. Yes.

Q. Of those, which had Mr. Hughes presented with as of your office visit in March of 2001?

A. Mr. Hughes had diabetes and hypertension.

Q. And did you later diagnose him with high

cholesterol?

A. Yes.

Q. When did you diagnose him with high cholesterol?

A. After his initial visit I -- you know, I received the blood test results the following day, and at that time determined that his cholesterol was elevated, and I called him at that time to discuss treatment.

Q. What was his cholesterol? What did the lab results show?

A. On March 8th, 2001, his total cholesterol was 239, his HDL cholesterol was 57, and his LDL cholesterol was 160.

Q. And at that time what were the normals for HDL and LDL?

A. Well, the goal for diabetics for LDL cholesterol is less than a hundred, and the goal for LDL cholesterol in patients that don't have cardiac risk factors is less than 130. So the 160 exceeded both for the LDL cholesterol.

Q. And now the LDL cholesterol is what's known as the, quote, bad cholesterol?

A. That's the common lay term for it, yes.

Q. And what course of treatment did you recommend for Mr. Hughes for his high cholesterol?

A. I prescribed Baycol, 0.4 milligrams.

Q. And what sort of a drug is Baycol?

MR. EZRIN: Object to form.

THE WITNESS: Baycol is commonly known as a statin, and what that does it -- is the -- it inhibits the synthesis of -- or it's a -- it decreases the rate of synthesis of cholesterol in the liver.

BY MR. REDDY:

Q. And what are the common side effects -- what are the side effects associated with statin medicines in general?

MR. EZRIN: Object to form.

THE WITNESS: Most common side effect that I encounter are muscle aches.

BY MR. REDDY:

Q. So myalgias or --

A. Yes. Also known as myalgias.

Q. And other than the muscle aches, are you aware of any other possible side effects associated with statin medicines?

A. We also monitor patients to make sure they don't have elevation of their liver chemistries because liver toxicity is also possible.

Q. And were you aware that these were possible side effects of Baycol when you prescribed it to

Mr. Hughes?

A. Yes.

MR. EZRIN: Object to form.

BY MR. REDDY:

Q. And to be clear, the side effects we just discussed were muscle pains --

A. Yes.

Q. -- correct?

Myalgias?

A. Yes.

Q. It -- was myopathy another type of side effect that you've encountered or are aware of?

A. Yes.

Q. And what is myopathy?

A. Myopathy is something that one can get from the adverse effect -- well, myopathy doesn't have to just be related to medication. It can be caused by other things. But it's muscle problems that patients experience that can manifest itself in different ways, including pain and weakness.

Q. And myalgias are specifically muscle pain?

A. Myalgias are the symptoms.

Q. I see.

A. Myopathy would be a diagnosis.

Q. And are you also -- were you aware that

BY MR. REDDY:

Q. And do you do that when you prescribe cholesterol medicines?

A. Yes.

Q. And what side effects do you tell them to watch out for?

MR. EZRIN: Same objection.

THE WITNESS: I tell them the most common side effects for statins. Those side effects include muscle aches as really the predominant symptom that they might experience.

BY MR. REDDY:

Q. So you tell them about the symptoms that they're probably going to experience?

A. Yes.

Q. Now, when you prescribed Baycol to Mr. Hughes, is that because you believe that the benefits of the drug outweighed its risks?

MR. EZRIN: Object to form.

THE WITNESS: Yes.

BY MR. REDDY:

Q. Is that generally why you prescribe any drug to a patient?

A. Correct.

Q. When did you next see Mr. Hughes?

A. My next visit was June 12th, 2001.

Q. And using the chart that we have in front of you as Exhibit 2, that's on page 39, is that the same as your office visit note for that day?

A. Yes.

Q. Okay. And what did you see Mr. Hughes for on that date?

A. He came in for a routine follow-up for his diabetes and hypertension and high cholesterol.

Q. And did he -- did he complain of any muscle aches or pains to you?

A. He did not according to the progress note.

MR. EZRIN: Object to form to the last question.

BY MR. REDDY:

Q. And if he had complained of muscle aches, would you have written that down?

MR. EZRIN: Same objection.

THE WITNESS: It's my practice to write down all the symptoms that patients tell me.

BY MR. REDDY:

Q. Now, your note indicates that Mr. Hughes had run out of Baycol for one week.

A. Correct.

Q. And did you and Mr. Hughes discuss Baycol at

this office visit?

MR. EZRIN: Object to form.

THE WITNESS: It's not documented in the progress note, but I indicated that I was going to recheck his lipid panel the next office visit which indicates that I probably told Mr. Hughes that normally I would have done it on that visit to monitor the effects of the medication, but since he was out of it for a week, it was something that I didn't want to do until he was back on the medication.

BY MR. REDDY:

Q. Did you have to prescribe Baycol again to Mr. Hughes at this visit?

A. It's my general practice to write the prescription with multiple refills on it, so I didn't indicate that I wrote another prescription. I probably told the patient to refill his medication.

Q. And did you diagnose Mr. Hughes with myopathy at -- on June 12th of 2001?

A. I did not.

Q. Did you diagnose Mr. Hughes with rhabdomyolysis in June of 2001?

A. I did not.

Q. When did you next see Mr. Hughes?

A. My next visit was September 4, 2001.

at that time?

MR. EZRIN: Object to form.

THE WITNESS: I don't have any indication of that on the progress notes.

BY MR. REDDY:

Q. Did you diagnose Mr. Hughes with myopathy at this office visit?

MR. EZRIN: Same objection.

THE WITNESS: I did not.

BY MR. REDDY:

Q. Did you diagnose Mr. Hughes with rhabdomyolysis at this office visit?

MR. EZRIN: Same objection.

THE WITNESS: I did not.

BY MR. REDDY:

Q. Now, it looks like Mr. Hughes complained that he had trouble sleeping.

A. Correct.

Q. Did you recommend any treatment for his sleeping problem?

A. There's no indication that I did on the progress note, and I don't remember outside of the progress note whether I did or not.

Q. And did you suggest any follow-up diagnostic tests?

A. I ordered blood chemistries and a lipid panel on him at that time.

Q. What did the blood chemistries and lipid panel show?

A. I only have the results of the glycosolated hemoglobin in the chart here.

Q. What did that show?

A. That was normal, at 5.4. I don't have the lipid panel or the chemistry panel that the progress note indicated that I ordered.

Q. Was Mr. Hughes still on Lotensin at this time?

A. I believe he was. You know, this was indicated on his patient profile, and it had not been discontinued, so I believe he was still taking it.

Q. And when did you next see Mr. Hughes after the September office visit?

A. My next visit was September 14, 2001.

Q. So you saw him about ten days later? Or I might have the dates wrong. No. Looks like ten days later.

A. I saw him on September 14th, 2001, correct.

Q. And why did you see Mr. Hughes at this time?

A. He had been seen in the emergency room, and he was scheduled for a post emergency room follow-up.

Q. And what was he seen in the emergency room for?

A. You know what, my progress note indicates he was seen because of sweats.

Q. And your progress note also indicates that he was actually not seen at the emergency room.

A. Yes.

Q. Is that because he may have left on his own part of being seen?

A. You know, I'll correct my statement. He went to the emergency room because of sweats, and he was not seen.

Q. Okay.

A. And the patient felt that this may have been due to his wisdom teeth, and he was planning to see the dentist.

Q. For the record, on Exhibit 2, that's indicated on page 41. If you could confirm that for me, that would be fantastic.

A. That's correct.

Q. Now, what was your assessment at that time of Mr. Hughes?

MR. EZRIN: Object to form.

THE WITNESS: On examination he had a loose right lower third molar, and I felt that he did have a dental problem which appropriately was going to be taken care of by the dentist, and I prescribed some pain

medication and antibiotics for him at that time.

BY MR. REDDY:

Q. Why did you prescribe the antibiotics?

A. Because he was diabetic he was at risk with this type of infection, whether it was in the mouth or anyplace else, and the particular antibiotic Pen VK is a good antibiotic for dental problems.

Q. And you also prescribed him Vicodin; is that correct?

A. Correct.

Q. And was that for pain?

A. Yes.

Q. And prior to seeing you on September 14th, had he seen someone else at Axminster on September -- looks like 10th?

A. Yes.

Q. And that's September 10th, of 2001?

A. Correct.

Q. And he saw a Dr. Bandari?

A. Correct.

MR. EZRIN: Counsel, can you direct me to the page in Exhibit 2?

MR. REDDY: Sure. It's on AMG 49.

MR. EZRIN: 49. Thank you.

BY MR. REDDY:

and prescribed Lisinopril 20 milligrams for his blood pressure, and this also is used for protection of the kidneys from the diabetes, from potential damage from the diabetes.

Q. And was Mr. Hughes still currently taking any cholesterol reducing medicine? Looks like it was Lovastatin.

A. Well, I had prescribed Lovastatin for him, but he had indicated that he had stopped all the medications except for the diabetes medicine, so I'm not sure he was taking Lovastatin at that time or not.

Q. But he was prescribed it?

A. Correct.

MR. REDDY: And I think that is all of my questions. We can take a quick break, or if you want to ask your questions, and check to see if I have anything else.

MR. EZRIN: Why don't we go off the record quickly.

MR. REDDY: Sure.

(Interruption in the proceedings.)

MR. REDDY: I have one question for you, Doctor.

BY MR. REDDY:

Q. When you're prescribing a medicine for the

first time, do you check the package insert or PDR?

MR. EZRIN: Object to form.

THE WITNESS: It depends on the medication. Most of the medications that I prescribe I'm very familiar with, and I don't need to do that. If it's a medication that I don't use a lot, then the answer is I do.

MR. REDDY: That's all the questions I have.

EXAMINATION

BY MR. EZRIN:

Q. Okay. Good morning, Dr. Jing. My name is Joshua Ezrin. I represent Julius Hughes, who is the plaintiff in this matter.

A. Okay.

Q. And I just wanted to ask you a couple follow-up questions. The first is when did you first start prescribing Baycol?

A. I don't remember.

Q. Can you give me a rough estimate?

MR. REDDY: Object to form.

THE WITNESS: I really can't.

BY MR. EZRIN:

Q. Was it prior to -- I'm assuming Mr. Hughes was not the first patient of yours that you --

A. No, he wasn't.

Q. He -- according to the records we have, he was first prescribed it in March of 2001.

A. Correct.

Q. Had you been prescribing Baycol for more than a year prior to that point?

MR. REDDY: Object to form.

THE WITNESS: I'm not really sure when Baycol was -- became available. I probably prescribed it sometime shortly after it became available, but I just don't know when that was.

BY MR. EZRIN:

Q. You indicated in your testimony earlier that you had prescribed or have prescribed in addition to Baycol a number of other statins.

A. Correct.

Q. Including Zocor, Lipitor, Pravachol, Lescol. I believe you indicated you did not prescribe Crestor.

A. Correct.

Q. Do you have any sense of which statin you had prescribed more than the other --

MR. REDDY: Object to form.

BY MR. EZRIN:

Q. -- during the time period when Mr. Hughes was taking Baycol?

A. No, I don't.
Q. So there was not -- there was no particular statin that you prescribed more than any others?
MR. REDDY: Object to form.
BY MR. EZRIN:
Q. Meaning you didn't have any particular preference for --
MR. REDDY: Object to form.
BY MR. EZRIN:
Q. -- for one or the other?
A. The answer is no. But our prescribing pattern in this medical group a lot of times depends on what's available to the patient in the drug formulary. So sometimes it's not so much a preference as much as it is what's available for the patient through the formulary which makes it affordable for the patient.
My recall was at that time that Baycol was available through this patient's insurance probably, and that's the reason I picked that medication over the other ones. Most of the time it's not really a matter of effectiveness of the medicine as just availability, but some of those medications are more potent than the other ones are.
Q. So you indicated that the cost of the drug is something that you factor into your consideration of

whether to prescribe it to a particular patient?

MR. REDDY: Objection to form.

THE WITNESS: The affordability for the patient is something I account for.

BY MR. EZRIN:

Q. You indicated that drug efficacy is also a concern, I believe. And is that a primary concern, or is that secondary to affordability?

MR. REDDY: Objection. Misstates testimony.

THE WITNESS: The drug efficacy is the major concern.

BY MR. EZRIN:

Q. So you consider that your primary concern when choosing one drug over another?

A. Well, you know, my concern is whether the drug works or not. If it works, then I'll prescribe it. But I will not prescribe something that doesn't work whether it's affordable or not.

Q. Understood.

What -- to what extent do you consider the drug safety when selecting a particular statin for a patient of yours?

MR. REDDY: Object to form.

THE WITNESS: I always consider safety, but, you know, I always look at whether there are risks that

are significant as opposed to what the benefits of the drug are.

BY MR. EZRIN:

Q. Counsel had asked you about the package insert earlier and the PDR, and I wanted to spend a little more time talking to you about that.

Would you please tell us how you typically get information regarding a drug that you're not familiar with? I'm talking about the safety information.

A. From, you know, many sources. Many times we have qualified speakers that come and give us education about the drug. The pharmaceutical representatives oftentimes are very helpful. They provide literature and if we have questions, then they provide researched answers through their companies. And then I read the package inserts.

Q. Do you look at the PDR?

A. Yes. But again, it depends on the particular drug.

Q. With respect to Baycol, do you have any recollection of reviewing the PDR before you prescribed it to Mr. Hughes?

A. I don't.

MR. REDDY: Objection to form.

BY MR. EZRIN:

Q. You do recall looking at the package insert, I believe, based on Counsel's question; is that correct?
A. I don't.
Q. So you don't have a specific recollection as you sit here today?
A. I don't have a specific recollection about looking at the package insert or the PDR.
Q. Do you recall any of the Baycol sales representatives that visited your office prior to the time in which you prescribed the drug to Mr. Hughes?
A. Yes.
Q. Do you recall the names of any of those individuals?
A. No.
Q. I will run by -- run over a couple names and see whether or not they sound familiar. One is Mercedes Kane. Does the name ring a bell?
A. I do not remember that person.
Q. How about Ross Del Mondo?
A. That name is familiar. It could have been somebody named Ross Del Mondo.
Q. That name sounds familiar to you. Do you make any connection between Mr. Del Mondo and Baycol in terms of him being a sales rep for Bayer?
A. He may have been --

MR. REDDY: Objection to form.

THE WITNESS: -- the sales rep for Bayer that came here.

BY MR. EZRIN:

Q. Do you have any recollection of discussing Baycol with Mr. Del Mondo?

MR. REDDY: Objection. Form.

THE WITNESS: I don't recall a specific discussion, but many of the reps have speakers that come in. I can't tell you whether he made those kind of arrangements or not.

BY MR. EZRIN:

Q. I'm going to give you another name of a sales representative. The name is Tooanh Nguyen.

A. I have no recall.

Q. How about Katrina Stewart? Does that name ring a bell?

MR. REDDY: Object to form.

THE WITNESS: No.

BY MR. EZRIN:

Q. I believe that is the entire list of sales representatives that I have. Sounds like the only one familiar to you was Ross Del Mondo?

A. Possibly.

Q. You indicated that the drug representatives

often provided literature regarding a drug.
A. Correct.
Q. Do you recall reading any literature from any sales representative regarding Baycol?
A. No specific recollection.
Q. Do you recall any qualified speakers coming to your office to talk to you or any other physicians regarding Baycol?
MR. REDDY: Object to the form.
THE WITNESS: No specification recollections.
BY MR. EZRIN:
Q. Do you recall any sales representative for Baycol providing any warning to you orally regarding rhabdomyolysis?
MR. REDDY: Objection to form.
THE WITNESS: No specific recollection.
BY MR. EZRIN:
Q. Do you recall any sales representative for Baycol giving you any oral warning regarding myopathy?
MR. REDDY: Objection to form.
THE WITNESS: No.
BY MR. EZRIN:
Q. Do you recall any sales representative for Baycol providing you any oral warning regarding myalgia?
MR. REDDY: Objection to form.

THE WITNESS: No specific recollection.

BY MR. EZRIN:

Q. Did any of the sales representatives for Baycol who ever visited your office indicate to you that the adverse events for Baycol was higher than that for comparable statins?

MR. REDDY: Objection to form.

THE WITNESS: I don't remember that.

BY MR. EZRIN:

Q. Had they informed you of that would that have changed your perspective on Baycol's safety profile?

MR. REDDY: Objection to form. Calls for speculation.

THE WITNESS: As always, I weigh the benefits and the risks of the medication.

BY MR. EZRIN:

Q. So when one drug that's comparable to another drug has a higher incident of adverse events as opposed to the comparable drug, would you consider the drug with the higher rate of adverse events to be less safe to your patients than the comparable drug that had the lower number of adverse events?

MR. REDDY: Objection to form.

THE WITNESS: It depends if the medication is truly comparable or not. If a medicine --

BY MR. EZRIN:

Q. And I'm assuming -- based on that question, I'm assuming -- I'm talking about comparable statins or comparable drugs.

MR. REDDY: Objection to form.

THE WITNESS: The statins have variable efficacy in achieving the goals for the patient. And it depends on how important it is to achieve those goals. If a medication is truly comparable to another one, I will pick the one that has the safety profile that -- the safest profile for the patient.

BY MR. EZRIN:

Q. Do you recall any of the literature that you reviewed regarding Baycol that indicated that Baycol was superior to other HMG-COA reductase inhibitors?

MR. REDDY: Objection to form.

BY MR. EZRIN:

Q. Am I pronouncing that correctly?

A. Uh-huh.

Q. Was superior to any HMG-COA reductase inhibitors because of its synthetic properties?

MR. REDDY: Objection to form.

THE WITNESS: I have a general recall about information that was given to me about the effectiveness of Baycol compared to other statins, but not specifically

because of any chemical structure differences that you alluded to.

BY MR. EZRIN:

Q. So you recall literature indicating that it was superior, but you don't recall the specific reason for which it was apparently more effective?

A. Correct.

MR. REDDY: Objection. Misstates testimony.

THE WITNESS: Right.

BY MR. EZRIN:

Q. I just want to make sure I was stating your testimony correctly.

A. Correct.

Q. Did anyone from Bayer, whether it was a sales representative or otherwise, make any effort to inform you of any of the actions the FDA took relative to those claims that it was more effective because of its synthetic properties?

MR. REDDY: Objection. Assumes facts not in evidence. Objection to form.

THE WITNESS: I don't have any recall.

BY MR. EZRIN:

Q. Did you ever become aware that the division of drug marketing, advertising, and communications for FDA cited Bayer for making such claims?

MR. REDDY: Objection --

THE WITNESS: I am not aware of that.

MR. REDDY: Objection. States facts not in evidence. And objection to form.

BY MR. EZRIN:

Q. Did the Baycol sales representatives tell you that the clinical trials regarding Baycol had been stopped before the planned end?

MR. REDDY: Objection --

THE WITNESS: I have no recall.

MR. REDDY: Objection to form. Assumes facts not in evidence.

BY MR. EZRIN:

Q. What did the Bayer sales representatives tell you, if anything, about clinical protocols relative to increased CKs?

MR. REDDY: Objection to form.

THE WITNESS: I don't have any recall.

BY MR. EZRIN:

Q. What efforts, if any, did the Baycol sales representatives make to inform you that persons were polled from clinical studies prior to their CK being elevated?

MR. REDDY: Objection to form.

THE WITNESS: I have no recall.

BY MR. EZRIN:

Q. Did any Baycol sales representative tell you that clinical trials for Baycol demonstrated that there was no rhabdomyolysis?

MR. REDDY: Objection to form.

THE WITNESS: I have no recall.

BY MR. EZRIN:

Q. If you had known that rhabdomyolysis had been reported in a clinical trial with respect to Baycol, would that have changed your view regarding the safety of Baycol?

MR. REDDY: Objection to form. Calls for speculation. Assumes facts not in evidence.

THE WITNESS: I would certainly look at it more carefully, but I was generally aware back then that rhabdomyolysis was associated with statins as a class of medications, so I knew that this could be a risk with any of the statins that were prescribed.

BY MR. EZRIN:

Q. Okay. What efforts, if any, did the Baycol sales representatives or anybody from Bayer make to inform you that the reporting of rhabdomyolysis incidents to the FDA was ten times higher for Baycol as compared to Lipitor?

MR. REDDY: Objection. Form.

THE WITNESS: I have no recall of that.

MR. REDDY: Objection. Form. Assumes facts not in evidence.

BY MR. EZRIN:

Q. Had they told you that, would it have changed your view of the safety profile of Baycol?

MR. REDDY: Objection. Form. Calls for speculation.

THE WITNESS: I mean, I think that any meaningful data that shows one drug which is comparable has a greater risk than other drugs would certainly make me consider whether I want to prescribe that drug very carefully or not.

BY MR. EZRIN:

Q. What efforts, if any, did any Baycol sales representatives or anyone from Bayer make to inform you that their rate of rhabdo reports to the FDA was 40 times higher for Baycol as compared to Pravachol?

MR. REDDY: Objection. Form.

THE WITNESS: I have no recall about that.

BY MR. EZRIN:

Q. Had you been informed of that fact, would you have -- would it have changed your attitude towards the Baycol safety profile?

MR. REDDY: Objection. Form. Calls for

speculation.

THE WITNESS: No. As always, if some scientific data shows something is more risky than a comparable medication, I would certainly consider that very carefully before prescribing it.

BY MR. EZRIN:

Q. What efforts, if any, did Baycol sales representatives or anybody from Bayer make to inform you that the -- in 1999 the reported rhabdomyolysis incidents to the FDA was 40 times higher for Baycol than it was for Lescol?

MR. REDDY: Objection. Form.

THE WITNESS: I have no recall of that.

BY MR. EZRIN:

Q. And, again, would that have changed your view with respect to the safety profile of Baycol?

MR. REDDY: Same objection.

THE WITNESS: Again, if something through scientific data shows that something may be more risky, then it certainly makes me consider that medication very carefully before I prescribe it.

BY MR. EZRIN:

Q. Do you still prescribe Lipitor today?

A. Yes.

Q. Do you still prescribe Lescol?

A. I don't commonly use it.
Q. How about Zocor?
A. Yes.
MR. REDDY: Objection to form.
BY MR. REDDY:
Q. Pravachol?
A. Yes.
Q. You do not still prescribe Baycol?
A. I do not.
Q. What's the reason for that?
MR. REDDY: Objection. Calls for --
THE WITNESS: Baycol was discontinued.
BY MR. EZRIN:
Q. Do you recall roughly when it was discontinued?
A. No.
Q. Were you ever made aware that Baycol received a black box warning?
A. I was not aware of that.
MR. REDDY: Objection. Form. Calls for speculation. Assumes facts not in evidence.
BY MR. EZRIN:
Q. What is your understanding as to whether or not Baycol was discontinued because of safety concerns?
MR. REDDY: Objection. Form.
THE WITNESS: I'm generally aware that it was

discontinued because of the problems with rhabdomyolysis, especially when it was used in combination with other lipid agents.

BY MR. EZRIN:

Q. Are you aware of the rate of rhabdomyolysis with respect to Baycol when taken on its own, not with other drugs?

MR. REDDY: Objection to form.

THE WITNESS: I am not, no.

BY MR. EZRIN:

Q. How did you first become aware that Baycol had been discontinued?

A. I don't remember. I mean, there are, of course, many sources. It could have been news media. It could have been the pharmaceutical reps. It could have been the pharmacies.

Q. Do you recall the Bayer sales representatives making any effort to inform you of the fact that Baycol had been discontinued?

MR. REDDY: Objection to form.

THE WITNESS: I don't recall a specific incident.

BY MR. EZRIN:

Q. Have you ever acted as an advisor for Bayer Corporation?

A. I have not.
Q. Have you ever been involved in any studies for Bayer Corporation?
A. No.
Q. Have you ever received any financial compensation from Bayer Corporation?
A. No.
Q. I'm going to ask you the same questions with respect to GlaxoSmithKline which is also a defendant --
A. All of the answers are no.
Q. Okay. So --
A. I have no connection with any pharmaceuticals in any shape, form, or otherwise.
Q. So you've actually never -- for any pharmaceutical companies, you've not participated in any studies?
A. No.
Q. You have not received any financial compensation?
A. No.
Q. You did indicate earlier that on occasion people from drug companies, drug reps, would bring qualified speakers to your office to speak to you and other physicians about drugs.
A. Correct.

MR. REDDY: Objection. Form.
BY MR. EZRIN:
Q. Have you ever been a qualified speaker yourself?
A. I have not.
Q. Have you ever attended any conferences that have been solely sponsored by Bayer Corporation?
MR. REDDY: Objection to form.
BY MR. EZRIN:
Q. That you're aware of?
A. I do not have any recall.
Q. Do you recall going to any conferences that -- in which Baycol was the topic?
MR. REDDY: Objection. Form.
THE WITNESS: I don't remember.
BY MR. EZRIN:
Q. Do you know in terms of the statins that were on the market at the time that Baycol was first introduced to the market, do you know how many other statins were on the market at that time?
MR. REDDY: Objection. Form.
THE WITNESS: Yes.
BY MR. EZRIN:
Q. How many?
A. I believe four.

Q. Which ones were those?
A. Mevacor, Zocor, Lipitor, and Pravachol. Oh, I'm sorry. There were five. Plus Lescol.
Q. So then Baycol, as far as you understand, was the sixth statin to hit the market?
MR. REDDY: Objection to form.
THE WITNESS: I don't know what order they hit the market.
BY MR. EZRIN:
Q. But that's your best understanding? Those --
A. My understanding is that Baycol was one of the six available statins at that time.
Q. I understand.
A. It certainly was not the first, and I'm not sure if it was the last at that time.
Q. What efforts, if any, did Baycol representatives or anyone from Bayer make to inform you that the rate of myopathy was higher for Baycol than for other comparable statins?
A. I don't have any recall.
MR. REDDY: Objection to form. Assumes facts not in evidence.
BY MR. EZRIN:
Q. What efforts, if any, did the Baycol sales representatives or anybody from Bayer make to inform you

that the rates of myalgia were higher for Baycol than for other comparable statins?

A. I don't have any recall.

MR. REDDY: Objection to form.

BY MR. EZRIN:

Q. Had you been aware of the fact that Baycol represented an increased risk for myopathy, myalgia, or rhabdomyolysis as compared to other statins, would that have affected your view of the Baycol safety profile?

MR. REDDY: Objection to form.

THE WITNESS: Again, if a medication which is comparable to others has a greater risk, it certainly does affect my prescribing that medication.

BY MR. EZRIN:

Q. How important is it to you as a doctor that sales representatives from any drug company provide you with an accurate list of the risks associated with any drug that you prescribe to your patients?

MR. REDDY: Objection. Form.

THE WITNESS: It's very important that any pharmaceutical representative provide as complete a picture of a medication as possible that indicates both the risks and benefits.

BY MR. EZRIN:

Q. I'm going to switch gears a little bit here.

A. Okay.

Q. We looked through the various records we have in Mr. Hughes' file. We went through all the various visits to your office, I believe we went chronologically and covered just about every visit that Mr. Hughes had with you and with the other doctors in your medical group.

A. Okay.

Q. One thing I wanted to ask you if a patient calls to your office to complain about either medication or some other problem and leaves a message, would that be reflected in the medical records?

A. Generally it should be.

Q. Can you describe how that process works?

A. Well, there are two ways it works. Currently we have electronic medical records, so when somebody calls in and asks to leave a message for a particular individual, it's documented in our EMR or computer, and so that record is -- you know, is always going to be there on our server. Prior to that time, prior to our instituting our computerized patient records, all messages were taken by hand, and they would be delivered by hand to whomever the message is directed. Once that message is reviewed, then it would be filed in the patient's chart.

Q. If Mr. Hughes claims that he left messages stating that he was complaining about problems associated with his use of Baycol, do you have any reason to believe that this is not true?

MR. REDDY: Objection. Form.

THE WITNESS: I'm sorry.

BY MR. EZRIN:

Q. Do you have any reason to believe that this is not the case?

MR. REDDY: Same objection.

THE WITNESS: Can you repeat the question?

BY MR. EZRIN:

Q. If Mr. Hughes claims that he called your office and left messages complaining regarding -- making complaints about the symptoms associated with his use of Baycol, do you have any reason not to believe that that was the case?

MR. REDDY: Objection. Form.

THE WITNESS: I don't have any messages that indicate that he complained about those type of symptoms of muscle pains. And I'm referring to messages that are in the paper chart here that go back to 2001. The two entries I have are February 2001 and September 2001.

BY MR. EZRIN:

Q. Would you please remind me when you first

instituted the electronic filing system?
A. October 2002. 2002.
Q. So that was prior to the time in which Mr. Hughes was taking Baycol?
A. Correct. 2001 we were on a paper system for all messages and medical records. The electronic medical records and electronic messaging system was instituted sometime in 2002.
Q. You had stated earlier that all statins have essentially the same safety profile, and I wanted to ask you what that was based on.
MR. REDDY: Objection. Form.
THE WITNESS: General medical knowledge. And my statement was that many of the adverse events were common to all statins, but it is my understanding that for each statin the safety profile may vary, but they all share common adverse events even though they may not -- the incidents may be different among the statins.
BY MR. EZRIN:
Q. Is it your understanding now that Baycol has a higher rate of adverse events and, therefore, has somewhat of a distinguishable safety profile from other statins?
MR. REDDY: Objection. Form.
THE WITNESS: It's my general knowledge that

that is the case.
BY MR. EZRIN:
Q. Had you known that at the time you prescribed -- had you known that back in March 2001, would you have prescribed Baycol to Mr. Hughes?
MR. REDDY: Objection. Form.
THE WITNESS: Again, if I'm aware that a comparable medication has a higher risk for the patient, then that certainly does affect my prescribing pattern.
MR. EZRIN: I believe that's all I have.
MR. REDDY: I've got a couple follow-up questions.

FURTHER EXAMINATION

BY MR. REDDY:
Q. Counsel asked you quite a few questions about adverse event reporting data. Is it -- in your practice do you normally see adverse event reporting data?
A. In what form?
Q. In any form.
A. Yes.
Q. Where?
A. Again, there would be multiple sources, other physicians, the news media, letters from the pharmaceutical companies, through continuing medical

education activities. So it could be a variety of sources.

Q. And earlier you were talking about if there was meaningful data and scientific data about the risks associated with drugs that you would take that it into account; is that correct?

A. Certainly.

Q. When you're talking about scientific data, that's -- are you talking about clinical trial data and studies that have controls to determine whether or not something can or cannot cause something? Is that correct?

A. Yes. Certainly those studies would be --

Q. Considered?

A. -- considered, yes.

MR. REDDY: That's all I have.

MR. EZRIN: Doctor, I think we're done.

THE WITNESS: Okay.

MR. REDDY: Great. What we commonly do in this situation -- and we can go off the record for just a second.

(Discussion off the record.)

MR. REDDY: We've, Counsel and the deponent have stipulated and agreed that the court reporter will prepare a transcript, forward it on to Mr. Jing for