# EXHIBIT F

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE BAYCOL PRODUCTS LITIGATION | ) MDL NO.: 1431(MJD) |
| This Document Relates to: | ) |
| JULIUS HUGHES | ) |
| VS. | ) CASE NO.: 02-CV-0058 |
| BAYER A.G., ET AL., | ) |

| | | |
|---|---|---|
| DEPOSITION OF | : | DANIEL M. ROVNER, M.D. |
| TAKEN BY | : | ADEL NADJI, ESQUIRE |
| Commencing | : | 8:36 A.M. |
| Location | : | 555 West 5th Street, 40th Floor<br>Los Angeles, California 90013 |
| Day, Date | : | Friday, January 19, 2007 |
| Reported by | : | KATRIN ECKERT, C.S.R. NO. 12696 |
| Pursuant to | : | Notice |
| Original to | : | JAMES SHEPHERD, ESQUIRE |

Pages 1 - 83

Job No. 103680

then, why do you consider yourself to be an expert in -- why do you expect -- why do you think you would be qualified to provide this report?

A Well, I mean --

MR. SHEPHERD: Objection to form.

Go ahead.

Q BY MR. NADJI: Go ahead.

A In the -- in general neurology and given the population I see, we see a lot of patients who are on statins, we read a lot about statins, and I have an interest in neuromuscular diseases.

Q Uh-huh. How many patients have you seen involving statins?

A Oh -- you mean who are on statins?

MR. NADJI: Would you please repeat to me his answer, the one right before this one?

(Answer read back as follows:

A "In general neurology and given the population I see, we see a lot of patients who are on statins, we read a lot about statins, and I have an interest in neuromuscular diseases.")

Q BY MR. NADJI: Okay. So you just said that you see a lot of patients who are on statins. And my question is how many patients have you seen who are on

statins?

A Thousands.

Q You personally?

A Oh, yes.

Q Okay.

A Almost every patient I see is on statin.

Q Why is that the case?

A They're a very popular drug. They're very effective for lowering cholesterol.

Q No. But why would a neurologist see a patient on statins?

A Oh, I might see a patient for a different reason, but they'd be on statins. When we say a patient comes in with a headache, the patient may very well be on a statin. But it's in the nature of my practice that I also see patients with myalgias, et cetera, that may be attributed to statins or not.

Q Do you think myalgia is -- that myalgia could be attributed to statins?

A Yes.

Q What case would it be attributed to statins?

MR. SHEPHERD: Objection. Form.

Q BY MR. NADJI: In what case would it be attributed to statins?

MR. SHEPHERD: Same objection.

THE WITNESS: I don't understand your question.

Q BY MR. NADJI: You just answered in the affirmative that statins could be attributed to -- myalgia could be attributed to statins. And I'm saying what type of scenario, what type of case would be attributed to statins?

MR. SHEPHERD: Same objection.

THE WITNESS: You mean what they present with? I don't understand the question, really.

MR. NADJI: Would you repeat to me please the deponent's answer?

(Record read back as follows:

Q "Do you think that myalgia could be attributed to statins?

A Yes.")

Q BY MR. NADJI: Okay. And what do you mean by that?

A Myalgia, which I will define as muscle aches and pains, can be caused by statins.

Q In what type of case would it be caused by statins?

MR. SHEPHERD: Objection. Form.

THE WITNESS: Again, I don't understand the question the way you're doing it. In what kind of case?

Q BY MR. NADJI: What type of patient with

myalgia -- what type of patient that presents with myalgia that would -- in which you would believe that the statins are a contributing factor to his or her myalgia?

MR. SHEPHERD: Objection. Form.

THE WITNESS: Well, a patient who presents with aches and pains, generally in the legs but not limited to legs, who may or may not have been started on a statin in the recent past.

Q BY MR. NADJI: How about lower back pain?

A I have not seen that.

Q How many patients have you seen with muscle aches and pains that you've attributed to statins?

A I'm not sure I can do better than guess.

Q You can't guess, but you can give me an approximation.

A Better than a hundred.

Q Okay. Were any of those patients on Baycol?

A That would be conjecture on my part. I don't know.

Q Okay. So in the patient population that were presented with general leg pain that you have attributed to statin, were there any type of factors that you considered in your diagnosis?

MR. SHEPHERD: Objection. Form.

THE WITNESS: I don't understand the question.

Q BY MR. NADJI: What did you look at when you diagnosed them?
A We rule out other causes of myalgia and myopathy.
Q What other causes could there be?
A In a patient population that I see, these would include inflammatory myopathies, generally, or other drug-induced myopathies or myalgias.
Q Okay.
A Or metabolic abnormalities.
Q Anything else?
A Well, not in the population I see.
Q Okay. The first one you listed is inflammatory myopathy?
A Uh-huh.
Q What is that?
A Myopathy such as polymyalgia rheumatica or polymyositis, inclusion body myopathy.
Q And how would you characterize those?
A They present generally with weakness. Polymyalgia rheumatica generally presents with pain.
Q Uh-huh. And the second one you listed was drug myopathy. What is that?
A Such as steroid myopathy.
Q Okay. And statins as well?

including hypertension that may uncover other myopathies, specifically myasthenia gravis.

Q What is that?

A It's an -- it's an autoimmune disease affecting muscle strength. It's generally not painful.

Q Can you recall any of those drugs?

A It's a host of them that may or may not: Beta-blockers, calcium channel blockers, many antibiotics.

Q Uh-huh.

A The list is quite lengthy.

Q Do you know if Lotensin is on that drug -- is on that list?

A What?

Q Lotensin?

A I'm not -- it may be. I'm not sure.

Q Yeah. And what do you mean by the word "uncover"?

A It aggravates the immunologic state such that the disease may express itself.

Q Uh-huh. So going again to metabolic abnormalities, would you please explain that to the ladies and gentlemen of the jury what you mean by that?

A Oh, thyroid abnormalities, various abnormalities in electrolytes, calcium, magnesium,

potassium can all cause muscle problems.

Q Uh-huh. How about exercise?

A Well, exercise certainly can cause myalgias.

Q Okay.

A It does me, anyway.

Q Okay. Can you please explain in your own words your methodology in coming to your opinion as reported in this report that you submitted?

A Methodology?

Q How did you come about your opinion?

A I reviewed the records and came to the opinion.

Q Which records did you review?

A Those records that we enumerated earlier.

Q Okay. Did you examine the plaintiff?

A No, I did not.

Q Have you spoken to the plaintiff?

A No, I have not.

Q Okay. Have you read his deposition?

A Yes, I have.

Q Did you base your opinion reading his deposition?

A That was a portion of what I read to collect my thoughts, yes.

Q Okay. Is there any reason why you don't have it listed on -- in your report?

A No, there is not.
Q Okay. Do you remember when you read the deposition?
A Oh, it's been quite some time.
Q Did you read the deposition of Lawrence Hughes?
A Yes.
Q Okay. And how about the deposition of Christine Hughes?
A Yes.
Q The deposition of Dr. Raymond Gin?
A Yes.
Q The deposition of Dr. Steven Trobiani?
A Yes.
Q Did you base your report on regarding these depositions as well?
A Well, a portion of it contributed to my thoughts, but the main thing was the medical records.
Q Okay. I'm not sure if I asked this question already, but I'll ask you. Did you examine Plaintiff Hughes?
MR. SHEPHERD: Objection. Asked and answered.
THE WITNESS: No.
Q BY MR. NADJI: Okay. Have you met with him?
A No.
Q Do you believe that examining the plaintiff

would give you a better assessment of the contents of this report?

MR. SHEPHERD: Objection. Form.

THE WITNESS: Well, one always likes to examine the patient. But as I said, my opinion is based on the records I reviewed. I'm not sure that examining him would contribute to my forming a different opinion given the nature of the records.

Q BY MR. NADJI: Well, could it provide you with a more accurate opinion if you had examined Dr. Hughes -- I'm sorry -- Mr. Hughes?

A I don't believe so.

Q Why is that?

A Well, just based on the medical records.

Q Uh-huh. Do you believe the medical records are all-encompassing?

A No, of course not.

Q Okay. Do you believe that medical records are thorough?

A Not always.

Q How about the medical records that you reviewed relating to Dr. -- to Mr. Hughes?

MR. SHEPHERD: Objection. Form.

THE WITNESS: As near as I can tell, they are fairly comprehensive as goes the routine office visits.

Q BY MR. NADJI: Uh-huh. Do you believe there is enough information in the medical records for you to make an assessment as to whether or not statins contributed to his myalgia?

A Yes.

Q Is there any question as to whether or not Mr. Hughes took Baycol, in your opinion?

A No.

Q Okay. Okay. I just have a few more questions before I think we should take our first break. I just want to wrap up. I have some questions just generally relating to education and training.

You stated that you received a degree in psychology from Berkeley.

A Uh-huh.

Q And you received your medical doctorate from the University of Autonomous University of Guadalajara. Do you have any other degrees?

MR. SHEPHERD: Objection. Asked and answered.

THE WITNESS: No.

Q BY MR. NADJI: Okay. Did you take any type of classes involving statins and their effect on muscles?

A I've been to seminars in which neuromuscular diseases are discussed --

Q Uh-huh.

A -- in which statins were a part of those discussions. They weren't specific classes on statins per se.

Q Uh-huh. How many seminars would you say that you have attended where statins were discussed?

A Over what period of time?

Q In your lifetime.

A That would be a guess again. I go to the --

Q Don't guess. If you can approximate, but you are not allowed to guess.

A Well, yeah.

I mean I go to the American Academy neurology meeting frequently. We do a lot of reading, you know, for continuing medical education. And I go to some local classes. I don't know. I mean better than 10 or 15.

Q Uh-huh. Okay.

A But as I say, those weren't on statins per se.

Q Do you know anybody that works for Bayer Corporation?

A No.

Q Okay.

MR. NADJI: Okay. I think it's a good time to take our first break, and -- about ten minutes; does that sound good?

MR. SHEPHERD: That's fine.

MR. NADJI: Okay.
(A brief break was taken.)
MR. NADJI: Okay. We're going back on the record.
Q BY MR. NADJI: So earlier today you stated that you, and tell me if I'm wrong, you said that you've primarily relied on plaintiff's medical records in formulating your opinion.
A That is correct.
Q Okay. What specifically in the plaintiff's medical record helped you formulate your opinion?
A Mostly the absence of complaints of myalgias or evidence of myopathy.
Q Okay. So it's absence of complaints. And the second reason was?
A Or evidence of -- clinical evidence of myopathy.
Let me rephrase that and say the absence of persisting complaints.
Q Anything else?
A That's it mostly.
Q Suppose that plaintiff complained of muscle aches and pains for a longer period of time than what is indicated in the medical records. Would that change your opinion?

MR. SHEPHERD: Objection. Form.

THE WITNESS: I can't -- I can't attest to that without reading the circumstances and accompanying examination. But if a patient had complained of myalgias for instance for over months and months and months, certainly a statin-induced myalgia would have to be a consideration.

Q BY MR. NADJI: How about shorter period of time?

MR. SHEPHERD: Objection. Form.

THE WITNESS: Can you define that more?

Q BY MR. NADJI: Well, you said "months and months and months." Suppose it's for one week.

A It's uncharacteristic of a statin-induced myopathy to -- or myalgia to last only a week.

Q Well, suppose you discontinue after that one week.

A In my --

MR. SHEPHERD: Objection. Form.

Q BY MR. NADJI: Go ahead.

A In my experience and training it takes anywhere from four to eight weeks for a statin myopathy to disappear. A statin myalgia, excuse me.

Q That's after discontinuation?

A Correct.

Q Just to clarify for the jury, what is "myalgia"?

A By "myalgia" we're referring to basically aches and pains. What it means is muscle pain.

Q Okay. And what is "myopathy"?

A Myalgia refer -- myopathy would refer to a disease of muscle in which there are structural changes in the muscle membrane frequently associated with the leakage of an enzyme called CK or CPK, which is creatinine kinase.

Q Is it possible to have myopathy without the leakage of CK?

A Yes.

Q So how would a doctor be able to differentiate between myalgia and myopathy?

A Well, that's sort of an apples and oranges question as it were.

Q Uh-huh.

A Myalgias can occur with or without accompanying myopathy.

Q Could you explain a little bit more than that?

A Well, myalgia is merely a symptom. Let's just say my muscles hurt. That may or may not reflect an underlying disease of muscle. For example, if I have muscular -- if I have polymyalgia rheumatica, there

was -- would be an underlying disease of muscle and I would have muscle pain. If I went to the gym and lifted weights, I will have muscle pain but not necessarily a myopathy.

Q Uh-huh. Would you consider myalgia to be an injury?

MR. SHEPHERD: Objection. Form.

THE WITNESS: Not necessarily.

Q BY MR. NADJI: In what situation would you consider it to be an injury?

A Well, in acute trauma you can injure the muscle. I'm not sure that -- you know, the nature of the question.

Q In your report you stated, "It is my opinion to a reasonable degree of medical certainty that Mr. Hughes was not injured" -- and that's the word that you used -- "in any way by his use of Baycol."

A Okay. I was thinking -- I was using -- I was thinking of the term in a different sense.

Q Uh-huh.

A Can you repeat your question?

Q Would you consider myalgia to be an injury?

MR. SHEPHERD: Objection. Form.

THE WITNESS: No. Myalgia is a symptom.

Q BY MR. NADJI: It's a symptom of what?

A It's a symptom of muscle pain. It just means muscle pain.

Q You said also in certain instances myalgia could be considered an injury; is that correct?

A Myalgia may result from an injury.

Q "May result from an injury."

Is there any case where myalgia would be considered an injury, in your opinion?

MR. SHEPHERD: Objection. Form.

THE WITNESS: No. I think you're using the terms backwards. Let's -- let's -- let me clarify. When we're talking about "injury," we're not talking about a traumatic injury. We're talking about any insult to the muscle in this case.

Q BY MR. NADJI: Uh-huh. You still -- what do you mean by that?

A Well, the way I used the term was to designate that I didn't think this patient had any injury to his muscles as a result of using Baycol.

Q Okay. Is it your opinion that he did not suffer from myalgia?

A He complained of back pain at one point.

Q But is it in your opinion that he suffered from myalgia -- that he did not suffer from myalgia?

A Well --

atypical of a statin-induced myalgia or myopathy. Further, there was no increase in CPK and a normal urinalysis. In addition, the patient's pain resolved quite rapidly after discontinuation of Baycol, which would be atypical for statin-induced aches and pains.

Q Are you saying that statins aches related to -- excuse me -- aches and pains related to statins would continue post discontinuation?

A Yes.

Q Okay.

A For at least, as I said before, for four to eight weeks. These drugs are lipophilic and get into every cell membrane in the body. They sort of leech out slowly.

Q Can you tell from this report how long -- when the aches and pains stopped after the discontinuation of Baycol?

A I believe he states that they were -- they -- where did he state this? "The described injury did not" -- oh, this is 6, part "e."

Q Uh-huh.

A "The described injury did not grow worse after Baycol was removed. The lower back pain did, in fact, improve."

I believe in his deposition it says something

similar.

Q Do you remember what part of the deposition stated that?

A It's on -- I don't remember which page it's on.

Q Not the page, but do you remember the content of the answer?

A A similar point, that the pain stopped rather promptly after discontinuation of Baycol.

Q Does that say anywhere the word "promptly" or anything relating to time frame in this sentence?

MR. SHEPHERD: Objection.

THE WITNESS: Well, in general terms I'd have to -- the implication is that it resolved.

Q BY MR. NADJI: But there is no reference to time --

A Per se?

Q -- time period --

A I'd have to --

Q -- in the report that you're looking at right now?

A No. In this report, no.

Q Okay. Thank you.

Suppose that Plaintiff Hughes did suffer from myalgia. Would you change your opinion then to that he did suffer an injury?

MR. SHEPHERD: Objection. Form.
Q BY MR. NADJI: You may answer.
A Not necessarily, no.
Q Okay. In what situation would you consider it to be an injury?
MR. SHEPHERD: Objection. Form.
Q BY MR. NADJI: You may answer.
A Well, I'm not sure -- if he had evidence of a myopathy, an ongoing deterioration of muscle, I would consider that an injury.
Q Uh-huh.
A Myalgia, as I mentioned before, is a symptom. It's an ache, a pain. I guess you could call that an injury. If he had had -- excuse me. If he had had persistent myalgias over a period of time, I would conclude that they may be due to a statin.
Q Uh-huh.
A I would withdraw the statin, and after four, six weeks, eight weeks I would expect his myalgias to resolve. I wouldn't expect any permanent injury to the muscle.
Q Is it possible to have -- well, is it possible to have myalgia without myopathy?
A Yes.
Q Okay. What evidence would you consider in

determining whether there is myopathy?
A Clinical evidence or factorial evidence?
Q Both.
A Well, clinically the patient generally presents with a weakness which may or may not be accompanied by aches and pains.
Q Uh-huh.
A The distribution of weakness may give you an idea of what kind of myopathy you're dealing with because there are hundreds of different diagnoses. Then you proceed with laboratory testing. Many myopathies, though not all, will reflect themselves in an elevated CK.
Q Uh-huh.
A Some basic laboratory studies are done to rule out remedial causes of myopathy. And then you may or may not do an electrodiagnostic study, that is an EMG, because there may or may not be abnormalities in muscle. And ultimately you may do a muscle biopsy to confirm the myopathy.
Q Anything else you want to add to this list?
A No.
Q So what do you mean when you say "weakness"?
A A loss of muscle power.
Q Would that be specific to the area -- would that be specific to any area of the body?

A It depends on what myopathy we're talking about.

Q Uh-huh.

A As a general rule myopathies are -- reflect themselves more prominently proximally, that is muscles of, you know, the bigger muscles, your thighs, your hips, shoulders, than distally. Though, that's not always the case.

Q Okay. Second factor you said was the distribution of weakness?

A Well, that's what I'm talking about, yes.

Q Okay. Suppose that Mr. Hughes presented to you that the pain included his thighs and buttocks region as well as his lower back. Would that change your opinion?

MR. SHEPHERD: Objection. Form.

THE WITNESS: All other factors being equal?

Q BY MR. NADJI: Yes, sir.

A No.

Q Okay. You also mentioned lab testing. Do you know what types of lab tests that you conduct to determine myopathy?

A Well, generally a CK. Though, a sed rate would be helpful. An ANA. I'd generally do a thyroid. A protein electrophoresis perhaps.

Q What is ANA?

Q And would the metabolic test help you determine whether he suffered from myalgia?

MR. SHEPHERD: Objection. Form.

THE WITNESS: Well, yes and no. I mean the fact that they're normal, they helped in ruling out certain things.

Q BY MR. NADJI: One of the ones you mentioned was the electrodiagnostic, which is an EMG?

A Yes.

Q How would that help you?

A It would be more confirmatory than anything else. Myopathies have certain abnormalities on electromyograms which tell you it's a myopathy. But again, that's not -- that's not true. I mean if it's -- the absence of abnormalities does not rule out a myopathy.

Q Uh-huh. I'll continue with Exhibit No. 1, page No. 2. You begin this paragraph by stating that "Baycol is one of a class of pharmaceutical agents commonly known as a statins."

Would you please explain to the jury what a statin is?

A Statins are a group of drugs which by inhibiting a certain rate limiting enzyme slow down the synthesis of cholesterol in the liver, thereby lowering

the total cholesterol. They have other effects as well. They lower LDL, or low density lipoproteins. And actually, they have other effects as well, anti-inflammatory effects.

Q Do you know of any side effects that statins have?

A Well, the most prominent side effect is myopathies, aches and pains. Myopathies occur in less than one percent of the patients, and there is an incidence of elevated what's called transaminases in a small percentage of cases.

Q The next paragraph here you discuss myalgia, and you state that the term "myalgia" refers to muscle pain. Do you consider muscle pain to be an injury?

MR. SHEPHERD: Objection. Form.

THE WITNESS: Well, we were in this before. I mean muscle pain can reflect an insult or injury to muscle.

Q BY MR. NADJI: How about muscle pain itself, would you consider that to be an injury, the pain itself?

MR. SHEPHERD: Objection. Form.

Q BY MR. NADJI: Yes or no? It's a yes-or-no question.

A Well, I guess I would say "no."

Q So if a person suffers from muscle pain, it is

in your opinion that they are not injured.
A That's not what I said.
MR. SHEPHERD: Objection. Form.
Q BY MR. NADJI: Would you clarify to the jury, please?
A I said pain may be a reflection of an injury.
Q You stated on the record that muscle pain is not an injury.
MR. SHEPHERD: Objection. Form. Misstates his testimony.
THE WITNESS: That's correct. I'm saying muscle pain reflects an injury.
Q BY MR. NADJI: "Reflects."
So if a person suffers from muscle pain, you would not consider that to be an injury?
A Not per se.
Q Okay. Meaning that it must be something else to accompany the muscle pain for you to consider that an injury?
MR. SHEPHERD: Objection to the form.
THE WITNESS: Yeah, it's the body telling you something is wrong.
Q BY MR. NADJI: Okay. Do you consider myopathy to be an injury?
MR. SHEPHERD: Objection. Form.

THE WITNESS: Yeah. Yes.

Q BY MR. NADJI: Why is that?

A Well, by myopathy, you know, there's a physical reflection of muscle injury in that there is weakness.

Q Is there physical reflection in myalgia?

A Not necessarily, no.

Q But there could be?

A Well, myalgia is a symptom; it's pain. There's not always a physical reflection of what's causing the pain.

Q Do you consider psychological pain to be an injury?

MR. SHEPHERD: Objection. Form.

THE WITNESS: Can you define that?

Q BY MR. NADJI: Pain that is not reflected physically.

MR. SHEPHERD: Same objection.

THE WITNESS: I'm not sure I can answer that question.

Q BY MR. NADJI: Why is that?

A Well, psychological -- I don't understand the question, really. Psychological pain may represent a psychiatric injury.

Q What is a psychiatric injury?

A Well, you know, mental state.

Q Let me -- you are a neurologist. Would you give me a brief -- what types of pain are there?
A Pain is pain. It's a subjective phenomena. What's painful to me may not be painful to you.
Q What are the workings of the brain perceiving pain?
MR. SHEPHERD: Objection. Form.
THE WITNESS: That's way, way beyond my expertise. There is -- there are volumes written on how the brain perceives pain and the various pain pathways.
Q BY MR. NADJI: Uh-huh.
A I mean there are whole books written on that.
Q Uh-huh.
A I don't know that I -- I can address that issue.
Q That's fine.
Would you consider pain without the underlying physical reflection to be an injury?
MR. SHEPHERD: Objection. Form.
Q BY MR. NADJI: You may answer.
A Without underlying physical injury, no.
Q "No"?
So taking that question to the next level, if a person suffers from myalgia, without myopathy, would you consider that to be an injury?

MR. SHEPHERD: Objection. Form. Asked and answered six times.

Q BY MR. NADJI: You may answer.

A Not in the -- in the context that you put it in, no.

Q Thank you.

MR. NADJI: Okay. I think this is a good time to take another break. Is that good for you?

THE WITNESS: Yeah.

MR. NADJI: Why don't we go off the record.

(A brief break was taken.)

MR. NADJI: Back on the record.

Q BY MR. NADJI: Looking at Exhibit No. 1, which is your report, page 2, toward the bottom there is a paragraph that begins with "Julius Hughes was born November 27, 1932."

Is that of any significance to your opinion?

A No -- well, it just defines his age.

Q Okay. Why is age important?

A Because there are certain diseases that are more common at certain age groups.

Q Okay. Do you know what those diseases are that would be common for a person like Mr. Hughes or his age bracket?

A Well, hypertension, diabetes, hernias, detached

retinas.

Q And what significance does that have in formulating your opinion?

A Not -- really none, except that hypertension, diabetes predispose one to a variety of diseases.

Q Okay. These four -- well, I guess they're diseases slash surgeries that you listed here -- could they have contributed to his lower back pain?

A Conceivably, yes.

Q Which ones?

A Well, diabetes, the recurrence of hernias, if that was the case.

Q What do you mean by that?

A Well, I don't -- there's no evidence that he had recurrent hernias, for instance.

Q Okay.

A And there is no evidence that his diabetes was particularly out of control at that time.

Q Did you see anything in plaintiff's records that would suggest to have been the cause of his lower back pain?

A No. Other than age? Aches and pains? No.

Q What do you mean by "other than age"?

A Well, people in that age group are more likely to have back pain than, say, somebody who's 15 or 20.

Q Okay. Is there any significance that he suffered the lower back pain while he was on Baycol?
A I believe not.
MR. SHEPHERD: Objection. Form.
Q BY MR. NADJI: You believe not?
A Right.
Q On what basis do you say that?
A Well, there is no reason to believe -- because there's no positive reason to believe that Baycol contributed to it.
Q What facts do you --
A Well, as I said, enumerated before, it would be the unusual location, though not impossible. This pain was associated with movement only, specifically turning over in bed --
Q Uh-huh.
A -- and it lasted a very short period of time. And of course it was unaccompanied by any evidence of myoglobinuria or elevated CK.
Q What's the first term you just mentioned, the first term of the two?
A Myoglobinuria.
Q And what is that?
A Spilling myoglobin or muscle globulin.
THE WITNESS: Myoglobin, you have that?

THE REPORTER: Not in my dictionary yet.
THE WITNESS: M-Y-O-G-L-O-B-I-N-U-R-I-A.
Q BY MR. NADJI: The second part here, it says here, "During the time Mr. Hughes was taking Baycol, there are no documented complaints of muscle aches, muscle pain or muscle weakness."
The term that I would like to focus on here is the word "documented." It's possible that he suffered from muscle aches, muscle pain, muscle weakness; however, it's not documented in medical records.
MR. SHEPHERD: Objection. Form. Calls for speculation.
THE WITNESS: That would be correct.
Q BY MR. NADJI: Okay. Then the next sentence here you said that "on August 24th, 2001, at the time Baycol was discontinued, Mr. Hughes had a normal CK of 126."
And I don't want to put words in your mouth, but you said that that's important because CK can suggest myopathy, elevated levels of CK can suggest myopathy.
A Correct.
Q Okay. And in the last sentence here, "It's my opinion to a reasonable degree of medical certainty," what does that mean, "reasonable degree of medical certainty"? Does that have any meaning to you?

A That's sort of a term of art used in the legal profession, I guess, but it would mean certainly that I would not attribute a diagnosis of Baycol-related muscle pain in this case.

Q But what is the standard reasonable degree of medical certainty?

MR. SHEPHERD: Objection. Form.

THE WITNESS: I'm not sure that I can answer the question as to the standard. I mean more certain than not.

Q BY MR. NADJI: Did anybody help you with creating this report?

A No, not really. Ms. Beck may have made some suggestions. I don't know whether I incorporated them or not.

Q Okay. Do you have drafts of those suggestions?

A No, not now.

Q What happened to those drafts?

A I'm sure I threw them away.

Q And what type of suggestions do you recall that she made?

A Oh, I have no specific recollection of all. It's been some time.

Q Okay. Has anyone else helped you draft this report?

Q BY MR. NADJI: Why do you say that?
A I toss out drafts.
Q Is it possible that Ms. Beck may have a copy of the draft?
A I guess it's conceivable.
Q Okay. You stated that Ms. Beck -- well, I don't want to put words in your mouth. You sent a draft to Ms. Beck. And what did she do exactly?
MR. SHEPHERD: Objection. Form.
THE WITNESS: I'm not sure. I mean we probably talked after that, or she scribbled some stuff in the margin and faxed it back to me.
Q BY MR. NADJI: Do you remember receiving a fax?
A I'm not sure.
Q Do you remember what type of edits that she made?
A I don't recall specifically, no.
Q Is it correct that you state only one opinion in this case, and this opinion is listed on page 3, and that is, quote, "It is my opinion to a reasonable degree of medical certainty that Mr. Hughes was not injured in any way by his use of Baycol"?
MR. SHEPHERD: Objection. Form.
THE WITNESS: That's correct.
Q BY MR. NADJI: Do you hold any other opinions

in this case?

MR. SHEPHERD: Objection. Form.

THE WITNESS: With reference to statins, no.

Q BY MR. NADJI: With reference to Mr. Hughes.

A No.

Q What facts support your opinion?

MR. SHEPHERD: Objection. Form. Asked and answered.

THE WITNESS: I think I have stated that. But the unusual location and the fact that the pain is only present with movement, that it was only of one-week's duration or very short duration. There was no associated elevated CK or myoglobin in urine.

Q BY MR. NADJI: And those are all the facts that you used in formulating your opinion?

A And the history of an absence of documented complaints of aches and pains or other evidence of a myopathic condition, yes.

Q Okay.

MR. NADJI: I would like to take hopefully one last break and then perhaps conclude the deposition. So this is a good time. I just want to review my notes.

MR. SHEPHERD: Sure.

MR. NADJI: And we'll go off the record.

(A brief break was taken.)

MR. NADJI: Let's go back on the record.

Q BY MR. NADJI: There is a couple of areas I'd like to touch up on before we call it a day. First one, I would like to go back to Exhibit No. 2, which is Dr. Trobiani's expert report. I would like you to take a look at page No. 2, No. 6 subsection (b).

In this report Dr. Trobiani states that "the claim of injury in the medical records is reasonably contemporaneous with the patient's ingestion of Baycol."

Do you agree with this statement?

A "Reasonably contemporaneous," yes, I do.

Q Okay. The next one is letter C, and here Dr. Trobiani states, "There is no other explanation for this injury apparent in the medical records I have reviewed."

Do you hold a similar position, or no?

MR. SHEPHERD: Objection. Form.

THE WITNESS: Well, I would say "no."

Q BY MR. NADJI: Okay.

A There was actually no diligent search for any other explanation. Given the short life of the pain, however, it's unlikely that any doctor would have pursued that any more aggressively.

As to alternate explanations for the pain, age, as I said before, diabetes, that sort of thing would also